In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-444 CR


____________________



REGINALD EUGENE MORRIS, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 410th District Court


Montgomery County, Texas


Trial Cause No. 00-06-03646-CR






 OPINION 


 On July 17, 1999, the JULIE V and a Wellcraft Nova Spyder collided on Lake
Conroe. As a result, three passengers aboard the JULIE V were killed. Contending that
Reginald Eugene Morris operated the Wellcraft at the time of the collision, the State charged
Morris with three separate counts of intoxication manslaughter. Tex. Pen. Code Ann. §
49.08 (Vernon 2003). (1) In July 2000, a jury found Morris guilty on each count. Morris v.
State, No. 09-00-477 CR, 2002 WL 31835085, at *1 (Tex. App.-Beaumont, Dec.18, 2002,
pet. ref'd). Morris appealed, and we reversed and remanded his case for a new trial because
of errors in admitting and excluding evidence. Id. at *17. 

 Before his retrial, Morris asserted he was not competent to stand trial. However, at
his competency trial in February 2004, a jury rejected his incompetency claim. 

 Subsequently, in August 2004, the State again tried Morris on three counts of
intoxication manslaughter and once again the jury found Morris guilty on each charge. The
jury assessed punishment on each count at eighteen years' confinement in the Texas
Department of Criminal Justice, Institutional Division, and a $10,000 fine. 

 Morris now appeals the jury's finding in his competency hearing. He contends that
the jury's finding is against the great weight and preponderance of the evidence. Morris also
appeals from the jury's finding of guilt in his August 2004 trial, and asserts the evidence
supporting his conviction is legally insufficient and that the trial court made various errors
in allowing and excluding evidence. Finally, Morris appeals from the trial court's judgment
and asserts the trial court erred in cumulating his sentences. 

 Morris raises eleven points of error in his brief. Having reviewed the record, we find
no reversible error with respect to the competency trial or the guilt phase of his intoxication
manslaughter trial. With respect to his sentence, we agree the trial court erred in the manner
it partially cumulated his sentences. As a result, we affirm Morris's convictions, and because
we agree that the trial court improperly cumulated his sentences, we modify the judgment
to provide that Morris's sentence on Count III run concurrently with his sentence on count
II. As reformed, we affirm. 

Challenge to Jury's Competency Finding

 In his first point of error, Morris asserts that the jury's finding him competent to stand
trial is against the great weight and preponderance of the evidence. Morris argues that he
was incompetent to stand trial because a traumatic brain injury caused him to have no
memory of the event. At the competency trial, Morris contended that he had no memory
from a period of approximately thirty minutes before the accident until four days later. 


 Standard of Review Under Texas law, a defendant is presumed competent and bears the burden of proving
he was incompetent by a preponderance of the evidence. Tex. Code Crim. Proc. Ann. art.
46B.003(b) (Vernon Supp. 2006). (2) A person is incompetent if he does not have:

(1) sufficient present ability to consult with the person's lawyer with a
reasonable degree of rational understanding; or

(2) a rational as well as factual understanding of the proceedings against the
person.


Id. at 46B.003(a). (3) When a defendant challenges a jury finding on which he bears the
burden, "the correct standard of review is whether after considering all the evidence relevant
to the issue at hand, the judgment is so against the great weight and preponderance of the
evidence so as to be manifestly unjust." Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim.
App. 1990). Because both elements of the test for incompetency address the defendant's
competence at a future date, rather than the time of the offense, a claim that the defendant
suffers from a memory problem of a past event would not generally trigger a competency
hearing. Further, we note that the State is not required to prove a culpable mental state for
a conviction for intoxication manslaughter under Section 49.08 of the Penal Code. Thus,
whether a memory lapse could result in a defendant's incompetence to stand trial for
intoxication manslaughter is debatable. Here, however, since the trial court allowed Morris
a competency hearing, and because the State does not contend that a competency hearing was
not required, we proceed under the assumption that Morris's memory deficiency triggered
a right to a competency proceeding.

The Competency Trial

 Morris called five witnesses and the State called one witness at the competency trial. 
Morris first called Dr. Steven Rosenblatt, a board certified psychiatrist, as an adverse witness. 
Dr. Rosenblatt agreed that as a result of the collision, Morris suffered a traumatic brain
injury. Dr. Rosenblatt indicated that Morris told him he made a conscious decision not to
drive the boat and went to sleep in the aft area of the boat. Dr. Rosenblatt agreed that if
Morris could not remember the events shortly before the incident that he would be unable to
testify regarding those events. Nevertheless, Dr. Rosenblatt stated that Morris could testify
to the things about which he had knowledge, and that even if Morris had amnesia for the
events immediately prior to the incident, he was not incompetent under the applicable
statutory test. Dr. Rosenblatt testified that Morris was aware of the nature of the charges
against him and the potential consequences of a trial, and that, even if he could not remember
the incident itself, he could assist his attorneys by providing relevant information about the
day of the accident. Dr. Rosenblatt testified that in his opinion, Morris was competent to
stand trial. 

 Morris also called Jack Zimmerman, a board certified criminal attorney. Although not
familiar with the facts of this case, Zimmerman testified that a person without the present
ability to consult with his attorney concerning the facts of the offense with which he is
charged is not competent to stand trial, unless no question exists about what happened. 
However, Zimmerman admitted that he would not file a motion claiming his client to be
incompetent just because the client claimed he was asleep when the crime was committed. 
Zimmerman also agreed that a defendant would not be considered incompetent if intoxication
caused the impairment. 

 Dr. Daneen Milam, a neuropsychologist, also testified for Morris. Dr. Milam
addressed numerous issues and testified that Morris could not: (1) give a reasonable account
of what happened at the time of the offense; (2) identify or locate witnesses; (3) help plan his
legal strategy; (4) follow testimony for the purpose of determining if there were errors; (5)
testify to relevant evidence or be cross-examined; (6) challenge prosecution witnesses; or (7)
disclose pertinent facts surrounding the alleged offense. Dr. Milam testified that in her
opinion, Morris was not competent to stand trial. However, Dr. Milam acknowledged that
Morris's intellectual abilities were normal and that during her interview, Morris knew who
she was and why she was there. Dr. Milam also stated that Morris had the present ability to
talk to his lawyer, understand the charges against him, and provide his attorney with
information for other portions of the day that he recalled that might be helpful to his defense. 
 Another witness called by Morris, Sergeant Kenneth Henderson, testified that the only
potential eyewitnesses to the collision itself were the people on the boats involved in the
collision. Gary Carlin, the Wellcraft's other occupant and one of the potential witnesses,
died in May 2000. Sergeant Henderson testified that none of the occupants of the JULIE V
could identify the Wellcraft's driver at the time of the collision but also stated that the
identity of its driver could be determined through factors other than eyewitness testimony. 

 Finally, Debbie Cummings, Morris's lifetime partner, testified that Morris was
unconscious for three to four days after the accident. During her testimony, Cummings
related several incidents occurring long after the collision that showed Morris continued to
suffer from an ongoing short-term memory impairment. 

 During its case, the State called Dr. Walter Quijano, a clinical psychologist. Dr.
Quijano testified that in his opinion amnesia itself is not a basis to find a person incompetent
to stand trial. Dr. Quijano recognized that there might be circumstances when amnesia,
together with an absence of evidence to allow a reconstruction of events, might render a
person incompetent. Dr. Quijano suggested that if a person had amnesia, it would be
important to determine if the circumstances could be shown by other witness-testimony or
physical evidence. Finally, Dr. Quijano suggested that Morris's amnesia was alcohol-induced. 

 The jury rejected Morris's incompetency claim. 

Application of Texas Law to Facts

 Morris relies principally on Jackson v. State, 548 S.W.2d 685 (Tex. Crim. App. 1977)
to support his claim that amnesia renders a defendant incompetent to stand trial. Morris
contends that his inability to recall events from a period of thirty minutes prior to the accident
until about four days later interfered with his ability to consult with his attorney, and that
because of this amnesia, he did not have a factual understanding of the proceeding against
him. 

 In Jackson, the Texas Court of Criminal Appeals rejected the argument that the
defendant's loss of memory rendered him incompetent to stand trial for a charge of voluntary
manslaughter. 548 S.W.2d at 692. The Jackson Court evaluated the defendant's trial to
determine whether he received a fair trial. Id. The Court cited the following factors as
relevant to its analysis: (1) the extent to which the amnesia affected the defendant's ability
to assist his lawyer; (2) the extent to which the amnesia affected the defendant's ability to
testify in his own behalf; (3) the extent to which the evidence could be extrinsically
reconstructed; (4) the extent to which the State assisted the defendant and his attorney in that
reconstruction; (5) the strength of the prosecutor's case and whether the amnesia prevented
the defendant from establishing an alibi or defense; and (6) other facts and circumstances
affecting whether the defendant had a fair trial. Id. (citing Wilson v. United States, 391 F.2d
460 (D.C. Cir. 1968). 

 At Morris's competency trial, the evidence concerning Morris's competency
conflicted. Two of the witnesses, Dr. Rosenblatt and Dr. Quijano, testified that Morris was
competent. To some extent, the testimony of Zimmerman (the attorney), supported both
Morris's and the State's contentions. Portions of Dr. Milam's testimony supported the jury's
conclusion that Morris was competent , but she also specifically testified that Morris was not
competent. In summary, the jury heard the evidence on both sides of the issue and rejected
Morris's claim of incompetence.

 A jury resolves conflicts in evidence by weighing testimony and then rejecting any or
all of a witness's testimony. Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). 
We hold the evidence presented on Morris's competency is sufficient to sustain the jury's
verdict.

 Moreover, because the transcript of Morris's subsequent trial is before us, we can
further evaluate the impact at trial, if any, of Morris's claimed lack of memory. In applying
the six factors set forth in Jackson to Morris's intoxication manslaughter proceeding, we
conclude that he received a fair trial. 

 There was substantial circumstantial evidence at the intoxication manslaughter trial 
tending to identify Morris as the Wellcraft's driver at the time of the collision. The State
introduced testimony that Morris owned the Wellcraft. Additionally, the witnesses saw the
Wellcraft leaving a boat dock shortly before the accident with two occupants, and the driver's
description tended to identify Morris. The evidence also showed that immediately after the
collision, witnesses identified two occupants on the Wellcraft that generally fit the same
descriptions as the persons who were on the Wellcraft when it left the dock. Shortly after the
collision, Steven Norman, a passing boater, found Morris unconscious near the Wellcraft's
steering wheel. In summary, circumstantial evidence supported the jury's conclusion that
Morris operated the Wellcraft.

 The trial testimony also indicates that both parties offered accident reconstruction
evidence. Post-accident photos of the Wellcraft's steering wheel showed that it had been
impacted in the collision. According to Dr. Jay Kovar, who treated Morris at the emergency
room, a steering wheel impact probably caused Morris's chest injuries. The State presented
two reconstruction experts, Dr. Richard Bernicker and John Laughlin, who testified in
support of the State's claim that Morris was the Wellcraft's driver. Morris also had two
experts, Dr. James Ziegler and Jonathan Craig Hale, who provided opinions that supported
Morris's claim that he was not the Wellcraft's driver. Thus, it appears that there was
sufficient physical evidence for experts to reconstruct the accident and express opinions on
whether Morris was driving immediately prior to the collision. 

 The jury also heard relevant testimony regarding the day's events from Morris.
Although Morris did not testify during the criminal trial, the criminal jury heard Morris's
testimony from a deposition he gave in a civil case about the events. In his deposition,
Morris denied under oath that he was driving the boat at the time of the collision. The jury 
heard Morris's testimony about his drinking during the day, and heard him testify that at the
point he retired for the evening he thought he had a sufficient amount to drink to the point
that he was getting drunk. Morris also testified that his last memory before waking up at
Hermann Hospital several days later was lying down on the back seat of his boat while it was
docked. Thus, the jury heard Morris's account of the day's events and his testimony
regarding his memory lapse.

 Finally, Morris's memory lapse itself did not render Morris incompetent to testify to
the day's events, had he chosen to do so. We find no evidence in the record to indicate that
had the trial been delayed further Morris might have benefitted from an improved memory. 
 One's inability to recall the past could be attributed to one or a combination of causes,
including one's failure to notice, failure to recall, brain disease, age, drugs, alcohol, or brain
injury. In many cases it may be difficult, if not impossible, to distinguish the true reason that
a person has little or no memory of a past event. Under Texas law, a defendant's assertion
that he cannot remember the details of the offense, without more, does not render him
incompetent. Jackson, 548 S.W.2d at 691-92. 

 To prove incompetence, Texas law requires that the defendant prove he does not have
a sufficient present ability to consult with his lawyer with a reasonable degree of rational
understanding, or that the defendant does not have a rational as well as a factual
understanding of the proceedings against him. Tex. Code Crim. Proc. Ann. art. 46B.003(a) 
This does not require that a defendant have the capacity to recall everything that might help
his lawyer or to understand each fact of the State's case. Rather, the statute only requires that
Morris possess the present ability to consult with his lawyer with a reasonable degree of
rational understanding. 

 For Morris to have a rational and factual understanding of the proceedings, Texas law
requires that he understand the proceeding against him, i.e., that he understand the State's
case was predicated on its contention that he was driving the Wellcraft at the time of the
collision while intoxicated. Pursuant to the statute, the relevant time frame for the
defendant's understanding is at the time of the proceeding. The statute does not require that
the defendant remember or recall the event in order for the defendant to understand the
nature of the proceeding or the factual basis of the State's claims against him.

 In summary, the jury at Morris's trial for manslaughter heard substantial evidence
regarding Morris's contention that he was not driving at the time of the collision. The
accident was subjected to reconstruction by expert witnesses. We find nothing that indicates 
Morris did not understand the nature of the intoxication manslaughter charges or was unable
to provide a reasonable degree of information concerning the day's events to assist his
attorneys in his defense. Finally, proving intoxication manslaughter does not require the
State to prove a culpable mental state; thus, there is no need for evidence regarding the
defendant's state of mind at the time of the offense. 

 Having reviewed the trial transcripts from both trials relevant to Morris's competency
claim, we find Morris's evidence does not establish that: (1) he was unable to consult with
his attorney with a reasonable degree of rational understanding; (2) he did not have a rational
understanding of the consequences of the proceedings against him; or (3) at the time of the
trials he did not have a factual understanding of the basis of the State's claims. The jury's
verdict rejecting Morris's claim of incompetency was not against the great weight and
preponderance of the evidence. We overrule Morris's first issue.Sufficiency of Evidence to Support Conviction

Standard of Review

 Morris's second issue challenges the legal sufficiency of the evidence supporting his
convictions. When we review legal sufficiency, we view the evidence in the light most
favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620 (Tex.
Crim. App. 2004).

 The jury convicted Morris of three counts of intoxication manslaughter, and each of
the counts relate to the same event. A person commits intoxication manslaughter if he: (1)
operates a watercraft; (2) is intoxicated; and (3) by reason of that intoxication causes the
death of another by accident or mistake. See Tex. Pen. Code Ann. § 49.08. 

 On appeal, Morris argues that the Wellcraft had the right-of-way at the time of the
collision, and that the JULIE V's operator failed to maintain a proper lookout or yield the
right-of-way. Morris analogizes the collision to an accident between two cars and identifies
his boat as the equivalent of a car with the right-of-way to travel in its designated lane. 
Morris concludes that an accident under these facts is caused by the operator's failure to yield
the right-of-way, and is not caused by any act or omission of the driver of the car with the
right-of-way even if that driver is intoxicated. 

 To support his argument that the Wellcraft had the right-of-way, Morris cites to
several of the Inland Navigation Rules. (4) See 33 U.S.C.A. §§ 2015-2017 (West 2001 & Supp.
2006). Generally, the Inland Navigation Rules create right-of-way rules for crossing vessels,

and in a crossing situation, require that the vessel that has the other on her starboard side 
keep out of the way and avoid crossing ahead of the other vessel. 33 U.S.C.A. § 2015(a). 

 Nevertheless, the Inland Navigation Rules do not create an absolute right-of-way for
the vessel on the right, as the vessel with the right-of-way is permitted to "take action to
avoid collision by her maneuver alone." 33 U.S.C.A. § 2017(a)(ii). Also, the Inland
Navigation Rules allow "departure from these Rules [if] necessary to avoid immediate
danger." 33 U.S.C.A. § 2002(b) (West 2001). Moreover, the applicable Inland Navigation
Rules require that each vessel proceed at a safe speed to allow each to take proper and
effective action to avoid a collision and stop within a distance appropriate to the prevailing
conditions. 33 U.S.C.A. § 2006 (West 2001). Thus, even if the Wellcraft had the right-of-way under the Inland Navigation Rules, the Rules permit consideration of other contributing
causes in evaluating a collision's cause.

 Generally, under maritime law, the responsibility for a collision between vessels is
based on each party's proportionate fault. In United States v. Reliable Transfer Co., Inc., 421
U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed. 2d 251 (1975), a maritime collision case, the Supreme
Court held "that when two or more parties have contributed by their fault to cause property
damage in a maritime collision or stranding, liability for such damage is to be allocated
among the parties proportionately to the comparative degree of their fault. . . ." Therefore,
Morris's contention that his Wellcraft had the right-of-way is only a factor to consider in
determining fault. 

 The Texas Penal Code also contemplates that both parties can be at fault for a given
event, and provides:

(a) A person is criminally responsible if the result would not have occurred but
for his conduct, operating either alone or concurrently with another cause,
unless the concurrent cause was clearly sufficient to produce the result and the
conduct of the actor clearly insufficient.


Tex. Pen. Code Ann. § 6.04(a) (Vernon 2003). 

 Our review of the trial record reveals sufficient evidence from which a jury could have
concluded that the Wellcraft operator's fault was sufficient to produce the resulting fatalities. 
First, the jury heard considerable evidence regarding the Wellcraft operator's intoxication. 
Second, the jury heard substantial evidence from which it could conclude that the operator
of the Wellcraft drove at an unsafe speed. There was no dispute that the victims died from
the injuries they suffered in the collision. We conclude that there was sufficient evidence in
the record from which the jury could find beyond a reasonable doubt that Morris's conduct
was a sufficient contributing cause of the collision and deaths. The jury could also find
beyond a reasonable doubt that the Wellcraft operator's intoxication contributed to the cause
of the collision. We overrule Morris's second point of error.


Evidentiary Challenges - Guilt/Innocence Trial


Standard of Review and Harm Analysis 


 Morris asserts the trial court erred in admitting and excluding evidence during his
trial. We review a trial court's decision to admit or exclude evidence under an abuse of
discretion standard. Carrasco v. State, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). We
will uphold the trial court's ruling if it is "reasonably supported by the record and is correct
under any theory of law applicable to the case." Id. 

 If a trial court errs in admitting evidence, we must conduct a harm analysis to
determine whether the error requires reversal of the judgment. See Tex. R. App. P. 44.2. If
the error is constitutional, we apply Rule 44.2(a) and reverse unless we determine "beyond
a reasonable doubt that the error did not contribute to the conviction or punishment." Tex.
R. App. P. 44.2(a). Otherwise, we apply Rule 44.2(b) and disregard the error unless it affects
substantial rights. Tex. R. App. P. 44.2(b). 

 Rarely do erroneous evidentiary rulings rise to the level of constitutional error. Potier
v. State, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). Generally, a defendant's
constitutional rights are not implicated when a trial court erroneously admits evidence. See
Bagheri v. State, 119 S.W.3d 755, 762-63 (Tex. Crim. App. 2003) (nonconstitutional error
when trial court erroneously admitted "retrograde extrapolation" evidence); Hankins v. State,
180 S.W.3d 177, 182 (Tex. App.-Austin 2005, pet. ref'd) (erroneous admission of prior
conviction analyzed under nonconstitutional harm analysis); Stovall v. State, 140 S.W.3d
712, 718 (Tex. App.-Tyler 2004, no pet.) ("A violation of the evidentiary rules that results
in the erroneous admission of evidence is nonconstitutional error."). 

Admission of Glen Harrison's Testimony 

 Morris's third point of error asserts the trial court erred in admitting Glenn Harrison's
testimony. Morris contends that Harrison's testimony was based on scientific testing that
was unreliably performed.

 The State called Glenn Harrison, the supervisor of the toxicology section of the
Department of Public Safety ("DPS") crime lab, as a witness during its case. Morris asserts
that the trial court erred in permitting Harrison to testify regarding the lab results that were
the product of the DPS's blood analysis. 

 Harrison's testimony concerned the DPS's blood sample obtained after the collision. 
After Morris arrived at the hospital on July 17, an emergency room technician, Michael
Mastel, obtained two blood samples from Morris. Mastel sent the first blood sample he
collected at 11:00 p.m. to the hospital lab. Mastel gave a vial containing the second blood
sample, drawn at 11:47 p.m., to State Trooper Angela Fountain. Trooper Fountain placed
the vial in the mail on July 18, 1999. 

 The mailed vial arrived at the DPS crime lab in Austin on July 30, 1999. On August
13, 1999, and August 16, 1999, an employee of the lab's toxicology section performed a gas
chromatograph analysis on Morris's blood sample for alcohol content. The two gas
chromatograph tests measured Morris's blood alcohol content at between 0.1809 gm/100 mL
and 0.1952 gm/100 mL. 

 Harrison testified before the jury, that in his opinion, Morris's blood alcohol content
was 0.18 grams per hundred milliliters or greater. Harrison explained that a gas
chromatograph measures the content for each sample in two gas columns. Because the tests
are run twice, and on each run there are two measurements, the two tests produce a total of
four measurements for the blood sample being tested. The lab then takes the lowest of the
four reported test results, rounds it down to two digits, and reports that value as the gas
chromatograph's test result. 

 In part, Morris's complaint about Harrison's testimony relates to control vials that
were tested along with Morris's blood sample. As part of the crime lab's analysis, nine
control vials are included within a larger group of unknown vials, one of which contained
Morris's blood sample. Morris points to the crime lab's protocols that include a section
labeled "SENSITIVITY/PRECISION," that states:

 Precision


 a) Within run (aqueous) (0.10 g/100 ml standards) - less than 2%
CV

 (This means that all the 0.10 g/100 ml standards within the run
are within 2% of each other.)

 b) Run to Run (blood) (0.15 g/100 ml Whole blood control) - less
than 4% CV (From one run to the next, there is less than 4%
variation in the Whole Blood Control.)


Harrison explained that the term "CV" means coefficient of variation. "Coefficient of
variation" is defined as "the ratio of the measure of variability, [usually] the standard
deviation, to an average, [usually] the arithmetical mean, about which the variation occurs." 
 Webster's Third New International Dictionary 438 (2002). However, in a worksheet
calculating the CV's on the aqueous controls prepared by Harrison, it appears that he defined
CV as the "absolute value of difference from the mean divided by the mean." 

 The DPS crime lab's results on the 0.10 aqueous control standards were alcohol
content measurements that ranged from a high of 0.1042 gm/100 mL to a low of 0.0963
gm/100 mL. Morris argues that the values from the aqueous control tests differ by 8.2%
(which Morris apparently calculated as (0.1042-0.0963)/0.0963). Based on Harrison's
calculations, from a total of sixteen measurements taken on the 0.10 aqueous control vials,
three fell outside the lab's protocol of a 2% tolerance, the largest varying from the mean by
5.09% . (5) 

 In explaining the consequences of the variations in the vials that exceeded the lab
manual's 2% precision level, Harrison testified that the crime lab's protocol for quality
assurance allows a variance of plus or minus 10% tolerance, rather than a variance of plus
or minus 2%. According to Harrison, the 10% provision in the lab manual's quality
assurance section controlled whether the DPS lab considered its testing reliable. Under a
section labeled "QUALITY ASSURANCE" the crime lab manual provides:

11. Determination of the quantity of ethanol in unknowns shall be based upon
instrument detector response on the unknowns in relation to response to the
0.10 g/100 ml ethanol standard. To verify the linearity of the response curve,
the results of the analysis of all of the standards must fall within +/- 10% of
their expected values. . . .


12. Analysis results from duplicate samples (on each column) must also agree
within 10% or be re-prepared and re-analyzed with the next batch, unless there
are extenuating circumstances (clots, decomposed sample, small vitreous
volume, very low values etc.) In such cases, either the lower of the two results
will be reported, the sample will be declared to be "unsuitable for analysis",
or it will be marked as "quantity not sufficient for analysis" based on the
guidelines of this procedure.


Harrison testified that despite three of the values exceeding the 2% precision requirement,
he considered the DPS lab's test results reliable because they fell within the plus or minus
10% variation allowed by the lab's quality assurance criteria. 

 Morris also points to several additional deficiencies in the State's testing of the blood
samples. Morris argues that the gas chromatograph tests reflect an inadequate separation of
ethanol from acetone and isopropanol in a test sample, and asserts that without sufficient
separation of materials the gas chromatograph studies on Morris's blood sample are
unreliable. Morris points to unexplained differences in the n-Propanol results for the test run
on August 13 when compared to the test of August 16. Finally, Morris questions the State's
documentation regarding the date it prepared control samples, and further questions the
absence of documentation to show the conditions under which the control samples were
prepared. 

 To evaluate Morris's complaints about the admissibility of Harrison's opinion, the
trial court held a Daubert (6) hearing. Morris objected to Harrison's testifying before the jury
and asserted that Harrison's testimony was premised on "science or the technique [that was]
not applied properly." The trial court overruled Morris's objections and allowed Harrison
to express his opinion before the jury that Morris's DPS blood tests had an alcohol content
of 0.18 grams per hundred milliliters or greater. On appeal, Morris contends that the State
did not prove by clear and convincing evidence that it properly applied the technique it used
to test Morris's blood for alcohol content. 

 With respect to expert witness testimony, Rule 702 of the Texas Rules of Evidence
provides:

If scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.


Rule 702 involves a dual inquiry into relevance and reliability. Mata v. State, 46 S.W.3d
902, 908 (Tex. Crim. App. 2001). With respect to relevancy, Rule 402 of the Texas Rules
of Evidence provides:

All relevant evidence is admissible, except as otherwise provided by
Constitution, by statute, by these rules, or by other rules prescribed pursuant
to statutory authority. Evidence which is not relevant is inadmissible. 


As for reliability, the proponent of scientific evidence must demonstrate by clear and
convincing evidence that the proffered evidence is reliable. Mata, 46 S.W.3d at 908. To
demonstrate reliability, the proponent of the evidence must show by clear and convincing
evidence:

the validity of the underlying scientific theory, the validity of the technique
applying the theory, and proper application of the technique on the occasion
in question. Factors that may affect reliability include, but are not limited to,
the following: (1) the extent to which the underlying scientific theory and
technique are accepted as valid by the relevant scientific community, if such
a community can be ascertained; (2) the testifying expert's qualification; (3)
the existence of literature supporting or rejecting the underlying scientific
theory and technique; (4) the technique's potential rate of error; (5) the
availability of other experts to test and evaluate the technique; (6) the clarity
with which the underlying scientific theory and technique can be explained to
the court; and (7) the experience and skill of the person who applied the
technique on the occasion in question.


Id. (footnote omitted).

 Blood alcohol test results taken in the hours following an accident are clearly
probative of both the Penal Code's "per se" theory and the impairment definition of
intoxication. See State v. Mechler, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005) (holding
that breath sample results from intoxilyzer taken an hour and a half after collision were
relevant to both per se and impairment theories of intoxication). Morris does not challenge
the relevance of the blood alcohol evidence or the proposition that a person's blood alcohol
content can be measured by gas chromatography. Rather, Morris's challenge is directed at
whether the technique was properly applied on the occasion in question. 

 Morris bases his argument on the precision of the lab's measurements of his blood
alcohol level and on whether his alcohol content was 0.18. One definition of precision is the
"degree of agreement of repeated measurement of a quantity." Webster's Third New
International Dictionary 1784-5 (2002). Since the issue for the jury was whether Morris
was impaired by virtue of drinking alcohol, or, whether Morris had a blood alcohol level of
greater than 0.10 when he was operating the Wellcraft, the precision of the measurement is
important only if errors in the State's testing procedures create the risk that Morris's actual
blood alcohol level is lower than the "per se" intoxication standard. Because Morris's blood
alcohol content greatly exceeded 0.10, the imprecision of the testing would need to be
substantial before the evidence was unreliable to prove the matter asserted: that Morris's
blood alcohol content exceeded 0.10. 

 We find that the record does not support Morris's complaint that the imprecision of
the test measuring his blood alcohol was sufficient to render his blood alcohol results 
inadmissible. The test data in the record reflects that the tests were accurate within plus or
minus 10%, a degree of accuracy sufficient to render Harrison's testimony reliable with
respect to the issues in question: that Morris's blood alcohol content exceeded the then
existing "per se" level, or that Morris operated the boat while impaired from drinking
alcohol.

 In our opinion, the trial court could reasonably conclude the appropriate standard was
the lab's quality control standard (allowing a plus or minus 10% deviation from the expected
value) in determining the reliability of the lab's results. The DPS lab results were within the
plus or minus 10% tolerance. Because the potential error in reporting Morris's blood alcohol
at 0.18 did not create a risk that Morris's actual blood alcohol content was lower than the
"per se" level, the trial court did not abuse its discretion in admitting Harrison's testimony
that the DPS lab test results showed Morris's blood alcohol content to be 0.18. The evidence
on the precision of the lab's testing showed that it was reliable to prove the proposition in
issue. Morris's third issue is overruled.

The Hospital's Blood Test

 In his fourth point of error, Morris complains of the trial court's admission of a blood
alcohol test done by the hospital on the night of the accident. That test was reported as
showing a blood alcohol content of 234 milligrams per deciliter of blood. Morris challenges
the sufficiency of the State's proof that the hospital's test equipment accurately tested
Morris's blood, and challenges the hospital's technique in applying the test. 

 The hospital lab at Conroe Regional Medical Center tested the blood sample in issue. 
The hospital utilized a Kodak Ektachem 750 to perform the test. The hospital's lab was
certified through the Clinical Laboratory Improvement Act, and had also passed inspections
from the Joint Commission for Hospitals and the College of American Pathologists. 

 Sammie Preston, a certified medical technologist with thirty-one years' experience and
a fifteen-year employee of Conroe Regional Medical Center, performed the test on Morris's
blood. The hospital used the Ektachem in the ordinary course of its business to perform a
variety of blood tests on the hospital's patients. The Ektachem underwent control testing
daily, and the control testing for July 16 through July 18 showed that the machine tested
within its designed criteria. Preston testified that results from the Ektachem are widely
accepted as reliable in clinical use, and that doctors use the test results in treating their
patients. Preston also testified that she had approximately eight years of experience with the
Ektachem machine. 

 Preston explained that at the time she ran the test on Morris's blood sample she was
proficient in the use of the Ektachem, and described it as a chemical analyzer using dry
chemistry. However, Preston admitted that she could not explain in detail the underlying
science behind the machine. Preston also acknowledged that the machine was used for
clinical tests, and that the machine's printout states: "RESULTS FOR MEDICAL USE
ONLY. NOT TO BE USED FOR FORENSIC PURPOSES." 

 Preston discussed the details of the testing she performed on Morris's blood sample. 
Preston testified that she received Morris's blood sample from the emergency room. After
spinning the vial in a centrifuge, Preston placed Morris's blood serum on a slide and
processed it with the Ektachem. Each slide contained dry chemicals that interact with the
patient's specimen once placed on the slide. Although Preston stated that she was not aware
of the exact chemicals utilized in the slides, the process creates a color metric that is then
measured in a color imager. The hospital created a printed report of the test's result. Preston
testified that the reported result of Morris's blood serum indicated a blood alcohol content
of 234 milligrams per deciliter. 

 Since the Ektachem's test result is based on the testing of blood serum, rather than
whole blood, the State also provided the testimony of Harrison, the DPS lab supervisor,
regarding the conversion of a serum blood test report into a whole blood equivalent. 
Harrison testified that a serum blood alcohol level is usually higher than a whole blood
concentration because prior to the test blood cells are removed from the material to be tested. 
Harrison testified that dividing the serum blood test result of 234 by 1.18 converts a serum
test into a whole blood equivalent. Harrison indicated that the conversion also required
converting the serum reading which was in deciliters to milliliters, as well as converting
milligrams to grams. According to Harrison, the conversion of the hospital's serum test to
a whole blood equivalent produced a result of 0.198 grams per 100 milliliters. 

 Morris also introduced evidence addressing the science behind the Ektachem tests. 
Patrick Demers, who holds a pharmacy degree and a master's degree in forensic chemistry,
testified as an expert witness for Morris. In his master's thesis, Demers addressed the
reliability of blood alcohol tests in hospital settings that utilized enzyme testing procedures. 
Demers calculated that the Ektachem's serum blood result of 234 translated to a whole blood
equivalent of 0.19. 

 Demers explained that hospital labs allow a twenty to thirty percent variation in the
precision of lab test results, whereas forensic labs have a margin of ten percent. In his
opinion, test results from the type of testing done at Conroe Regional Medical Center should
only be used as screening procedures to show that a substance is not present, and not as a
method to show that something is present. 

 Finally, at the State's request during a hearing outside the jury's presence, the trial
court took judicial notice of two reported cases from other jurisdictions holding that no error
occurred due to the admission of Ektachem test results in intoxication cases. See State v.
Lutz, 707 A.2d 159, 162 (N.J. Super. Ct. App. Div. 1998); State v. Donahue, 18 P.3d 608
(Wash. Ct. App. ), review den., (Wash. 2001).

 Morris contends that the State failed to show the reliability of the science underlying
the Ektachem. However, the "party seeking to introduce evidence of a scientific principle
need not always present expert testimony, treatises, or other scientific material to satisfy the
Kelly test." Hernandez v. State, 116 S.W.3d 26, 28-9 (Tex. Crim. App. 2003) (citing Kelly
v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992). Some of the factors courts use in assessing
the admissibility of expert testimony are set out in E.I. du Pont de Nemours and Co. v.
Robinson, 923 S.W.2d 549, 556 (Tex. 1995). The list of non-exclusive Robinson factors
includes:

(1) the extent to which the theory has been or can be tested; 

(2) the extent to which the technique relies upon the subjective interpretation
of the expert; 

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as
valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique. 


Robinson, 923 S.W.2d at 557 (citation and footnote omitted); see also Merrell Dow
Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997). Moreover, the Court
of Criminal Appeals stated in Kelly that the factors affecting the trial court's determination
of reliability include but are not limited to:

(1) the extent to which the underlying scientific theory and technique are
accepted as valid by the relevant scientific community, if such a community
can be ascertained; 

(2) the qualifications of the expert(s) testifying; 

(3) the existence of literature supporting or rejecting the underlying scientific
theory and technique; 

(4) the potential rate of error of the technique; 

(5) the availability of other experts to test and evaluate the technique; 

(6) the clarity with which the underlying scientific theory and technique can
be explained to the court; and 

(7) the experience and skill of the person(s) who applied the technique on the
occasion in question.


Kelly, 824 S.W.2d at 573.

 The trial court heard evidence on the majority of these factors. Further, Preston
testified about the Ektachem's non-judicial use by hospital labs as a clinical test for alcohol.
With respect to the non-judicial use of the hospital's clinical test in this instance, we observe
"[t]hat an expert testifies based on research he has conducted independent of the litigation
provides important, objective proof that the research comports with the dictates of good
science." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir.
1995) (upon remand). Demers, who based his master's thesis on the accuracy of hospital lab
testing equipment, testified that hospital lab testing for alcohol had a potential error rate of
thirty percent. 

 Finally, the issue of reliability is intertwined with the purpose for which the evidence
is offered. As the Court of Criminal Appeals has stated, "[t]he proffered testimony must be
sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." 
Mata, 46 S.W.3d at 908. One of the disputed issues in this case was whether Morris's blood
alcohol exceeded 0.10 milligrams per deciliter. Even if the Ektachem erred by
overestimating Morris's blood alcohol content by as much as thirty percent, the Ektachem's
reported test result, when factoring out the potential error, remains probative of whether
Morris's blood alcohol content exceeded 0.10. 

 The evidence presented in the trial court supports the conclusion that the Ektachem
could determine blood alcohol levels within a potential error of thirty percent. Additionally,
the testimony in the record is sufficient to support the trial court's conclusion that the
Ektachem's test result, under the facts and circumstances of this case, could reliably be used
to address the question of whether Morris's blood alcohol content exceeded 0.10. We also
hold the evidence sufficient for the trial court to rationally conclude that the test was properly
performed on Morris's blood; i.e., that the technique was applied properly. We conclude that
the trial court did not err in admitting the results of the hospital blood test. We overrule
Morris's fourth issue.



Retrograde Extrapolation

 In his fifth issue, Morris argues that the trial court erred in allowing Glenn Merkord 
to testify about retrograde extrapolation. "Retrograde extrapolation is the computation back
in time of the blood-alcohol level -- that is, the estimation of the level at the time of driving
based on a test result from some later time." Mata, 46 S.W.3d at 908-09. Merkord, a DPS
technical supervisor, was in charge of the breath alcohol test program for the six county area
around Conroe, Texas. Merkord holds a masters degree in biology and a certification as an
intoxilyzer operator. 

 At the Daubert hearing, Merkord testified to the results of his extrapolation analysis,
and offered his opinion Morris had a blood alcohol level of .217 at the time of the accident. 
Merkord said this figure was a reliable estimate. Merkord testified that retrograde
extrapolation is generally accepted by experts in his field as a valid technique "as long as it's
done correctly." Merkord explained that he began working for the DPS in February 2004,
and received four months of training from the DPS pertaining to alcohol, and also attended
a course at the Center for Law and Action that involved intoxication. His four month
training period by the DPS included two to three hours specific to retrograde extrapolation. 
At the Center for Law and Action, he received a few more hours of training devoted to
retrograde extrapolation. 

 Morris's cross-examination of Merkord focused on the difficulty in accounting for
variables that could affect one's absorption and elimination of alcohol. Merkord testified
during his cross-examination that elimination rates vary from 0.008 to 0.04. Merkord
admitted that he did not know the percentage of the population that fell outside the normal
elimination rate. He further acknowledged that elimination rates varied from day-to-day, but
that he did not attempt to account for day-to-day variations in his calculation of Morris's
blood alcohol level. Merkord also stated that the technique to his extrapolate a blood alcohol
level is dependent upon starting with a reliable blood alcohol test. 

 Merkord testified that calculating an alcohol level requires accounting for the effects
of absorption and elimination. Merkord stated that absorption occurs as alcohol goes from
the stomach to the digestive system, and that elimination occurs as the body metabolizes, or
"burns," alcohol. Merkord explained that the generally accepted rate of metabolism for
alcohol in the general population falls between 0.015 and 0.02 grams per deciliter per hour. 
He further acknowledged that published data indicates that elimination rates range from
0.008 to 0.4. Merkord stated that his assumption about the proper elimination rate to apply
in Morris's case was supported by subtracting the blood alcohol result of the Conroe
Regional Medical Center from the later DPS result. In the approximate forty-seven minutes
between these tests, Merkord calculated that Morris eliminated 0.018 grams of alcohol. 
Merkord pointed out that in his calculations, he used an elimination rate of 0.015, and that
his use of the lower elimination rate resulted in a more conservative calculation of Morris's
probable blood alcohol level. Merkord also pointed out that he assumed that Morris had one
unabsorbed beer, and that assumption also worked to Morris's advantage. 

 Merkord testified that he utilized information contained in Morris's deposition
regarding Morris's drinking during the day and when Morris last ate in his effort to analyze
Morris's blood alcohol content. Merkord mathematically calculated the whole blood alcohol
content from Conroe Regional Medical Center's serum blood test and derived from that test
a whole blood equivalent of 0.195. Merkord testified that based upon the accident's
occurring around 9:30 p.m, and Morris's testimony indicating that he last ate that afternoon,
he believed that Morris had fully absorbed all the alcohol ingested prior to the accident. 
Merkord also stated that even if one assumed that the last beer that Morris drank had not
been fully absorbed, Morris was still over the legal limit of 0.10. In addition, Merkord
testified that about an hour after the blood test at Conroe Regional Medical Center, the DPS
obtained another blood sample showing Morris's blood alcohol to be 0.18. Merkord
explained that these two tests translated into an approximate elimination rate of 0.015 per
hour. 

 Merkord's testimony demonstrates a knowledge of the factors that can create
uncertainty in projecting blood alcohol levels. Merkord also appreciated that using an
average elimination rate for the general population creates additional uncertainty in a
calculated value for an individual's blood alcohol level at the time of an accident. According
to Merkord, the calculated value from a retrograde extrapolation is subject to a potential error
of plus or minus 20%. Merkord testified that even if his calculated value for Morris's blood
alcohol content was off by 20%, Morris would still have been over the legal limit of 0.10 at
the time of the accident.

 Before the jury, Merkord testified that his estimate of Morris's blood alcohol content
at the time of the accident was 0.19. Merkord testified that uncertainty exists with certain
variables used to calculate a person's blood alcohol level, and as a result, the derived value
to which he testified "is expressed not as a single number, but as a range of probable values." 
Merkord explained to the jury that his calculation could be off by plus or minus 20% "[t]o
account for uncertainty in that calculation." 

 It appears that the calculation Merkord presented to the jury varied from his testimony
at the Daubert hearing. The change in testimony appears to be due to his attempt to account
for the hypothetical possibility of unabsorbed beer in Morris's digestive system at the time
of the accident. Morris's testimony was that he last purchased alcohol at a bar, and a receipt
from the bar indicated that Morris paid for the purchase at 8:17 p.m. Merkord's trial
testimony assumed the possibility that Morris had one unabsorbed beer in his system at the
time of the accident. Merkord's assumption about the possible unabsorbed beer changed the
opinion he expressed at the Daubert hearing from an alcohol content result of 0.217 to 0.19
grams per 100 milliliters. 

 In support of his contention that the trial court erred by admitting Merkord's 
testimony, Morris relies principally on the Court of Criminal Appeals opinion in Mata v.
State. In Mata, the Court of Criminal Appeals held that a trial court abused its discretion in
admitting retrograde extrapolation testimony by the State's expert. The Court stated:

 We believe that the science of retrograde extrapolation can be reliable
in a given case. The expert's ability to apply the science and explain it with
clarity to the court is a paramount consideration. In addition, the expert must
demonstrate some understanding of the difficulties associated with a
retrograde extrapolation. He must demonstrate an awareness of the subtleties
of the science and the risks inherent in any extrapolation. Finally, he must be
able to clearly and consistently apply the science.


 The court evaluating the reliability of a retrograde extrapolation should
also consider (a) the length of time between the offense and the test(s)
administered; (b) the number of tests given and the length of time between
each test; and (c) whether, and if so, to what extent, any individual
characteristics of the defendant were known to the expert in providing his
extrapolation. 


Mata, 46 S.W.3d at 916. 


 There are a number of distinctions between the case before us, and that before the
Mata Court. In Morris's case, Merkord explained to the trial court and the jury that he used
a number of factors that favored Morris in calculating Morris's blood alcohol. First, Merkord
used a 0.015 elimination rate, the lower of the range of normals. Second, in his testimony
before the jury Merkord assumed that Morris had not fully absorbed his last beer, when he
could have assumed that all alcohol had been fully absorbed at the time of the accident. 
Third, Merkord explained to the trial court and to the jury that the process of retrograde
extrapolation takes a number of variables into account, and that the result is an estimate that
had a potential error of plus or minus twenty percent. Finally, he agreed that his calculations
were dependent upon the accuracy of the blood testing on which he relied. Thus, we
conclude that Merkord clearly explained the science and how he applied it to the trial court
and to the jury in a manner sufficient to allow the trial court to evaluate the reliability of his
testimony. 

 We also conclude that Merkord's testimony showed an appreciation for the difficulty
of evaluating the effects of absorption and elimination. He provided the trial court and jury
with a measure of his precision by providing them with an error factor of plus or minus
twenty percent. Despite an apparent inconsistency between the conclusion Merkord first
reached regarding Morris's blood alcohol content at the preliminary hearing and the figure
he expressed at the trial, the change in his testimony is related to his attempt to account for
differences of opinion regarding when Morris finished his last beer. The methodology
applied by Merkord in reaching each conclusion accounts for the biological effects of both
elimination and absorption. Additionally, Merkord used an elimination factor in all of his
retrograde analyses of 0.015 that the Court recognized in Mata as the generally suggested
rate used in most of the literature. Id. at 914. 

 As directed by Mata, we also look to additional factors of the timing of the testing 
in issue. The length of time between the offense and the first test in Morris's case is similar
to that in Mata, as in both the evidence reflected an approximate two hour interval. 46
S.W.3d at 915. In Morris's case, we have two blood tests taken approximately one hour
apart. In contrast, although two breath tests were conducted in Mata, they were conducted
in a time frame so close together that they were evaluated as only one test. Id. at 905. Thus,
in Morris's case there is additional test data that was not available in Mata. Moreover, this
data was relevant to Merkord in evaluating whether Morris was in the absorptive phase. The
two test results demonstrate that Morris's blood alcohol was not on the increase when the
second test was done. Unlike Mata, in which there was only one valid test, Morris's being
in the elimination phase was a known variable. Finally, in Morris's case, Merkord's data
included Morris's deposition from a civil case related to the events of the day of the collision. 
Morris's testimony provided substantial information about the type and quantity of alcohol
he consumed, what he ate that day, when he last ate, and when he last drank. The State's
expert in Mata had no similar data to utilize in forming his opinion. On the record here, we
hold that the trial court did not err in admitting Merkord's retrograde extrapolation estimate.

 Nevertheless, if we were to assume it was error to admit the retrograde extrapolation
testimony, we would conduct a harm analysis to determine whether the alleged error
required a reversal of the judgment. Tex. R. App. P. 44.2. Most evidentiary errors are
disregarded unless the error affected substantial rights. Tex. R. App. P. 44.2(b). Even if it
was error to admit the retrograde extrapolation testimony, when reviewing the overwhelming
evidence regarding Morris's intoxication, we would conclude that the effect, at most, was
slight. For example, in Morris's deposition testimony, he accounted for the effect of his
day's drinking as follows:

 Q. Did you drink to the point of intoxication on July 17,
1999?

 A. Not at first.

 Q. Ever?

 A. I think after we got to Del Lago it was wise not to take
the boat out. It was getting to that point.

 . . . .


 Q. [] Did you think it would be unsafe for you to operate a
boat when you decided to lay down on the bench seat?

 A. Yes. It was - it was time to just call it a night.

 Q. Because it was late and dark?

 A. We had been on the lake all day, we had been drinking. 
It was time to call it a day.

 . . . .


 Q. You would agree that you probably had had too much to
drink to drive that boat in a prudent and safe manner?

 A. That and the weather and with lake patrol. Yeah, it was
just- it wasn't worth going out.

 Q. All right. But part of the reason was that given the
amount of alcohol that you had had that day that it just
would not have been prudent for you to drive that boat,
correct?

 A. No, sir. If we went into Del Lago and started drinking,
we were not going out.

 Q. And the reason is because you would have had too much
to drink.

 A. If we had gone in and started drinking, yes.

 Q. Which is what you did.

 A. Yes, sir. But up until the point we got into Grandstand,
no, we were okay. We could have got out. But lake
patrol was getting heavy, it was getting dark and we just
decided that we weren't going out. 

 . . . . 


 Q. In fact, that day you drank your normal amount, which
doesn't get you drunk, right?

 A. Yeah, it was probably a little bit. I shouldn't have been
out on a boat.

 Q. Okay. But you drank what you normally did on a
weekend when you're just relaxing and unwinding and
hanging out with friends. Isn't that fair enough?

 A. A little bit more this weekend, I would imagine.


 Q. All right. Had you consumed enough alcohol to where
your normal coordination, reaction times might have
been affected somewhat?

 A. I'm not sure.

 Q. Don't know?

 A. No. All I know is I would have had it on my breath, and
that would have been sufficient cause.


 Additionally, the jury heard detailed evidence concerning Morris's behavior from a
witness who saw him departing the dock and operating the boat just before the collision from
which it could conclude that he was intoxicated. Brian Ross testified that he saw two men
who appeared intoxicated in the boat docked at Del Lago Marina, a large convention center. 
He then witnessed them depart from the dock, and the one fitting Morris's description was
at the controls. Specifically, prior to the men's departure from the dock, Ross observed the
men shining a spotlight up into the hotel area while shouting obscenities regarding the
opposite sex. Ross described their behavior as that of intoxicated persons. Additionally,
Ross testified that their continual revving of the boat's motor was very loud and obnoxious. 
Finally, Ross explained that, soon after departing the dock area, he heard the boat accelerate
rapidly, and that it was a "very pronounced sound" because of the type of boat. (7) 

 Together with other testimony regarding Morris's blood alcohol content and Morris's
own testimony about his drinking on the day of the incident, Ross's testimony is highly
probative of whether Morris violated the provisions of the Texas Penal Code. A violation
of this provision of the Penal Code can be proven either by proving that an individual has
more than a 0.10 blood alcohol content at the time of the accident, or by proving that one
does not have the normal use of mental or physical faculties by reason of the introduction of
alcohol into the body. See Tex. Pen. Code Ann. § 49.01 (2)(A) (Vernon 2003). 

 Expert opinions based upon retrograde extrapolation are not a necessary prerequisite
to sustaining a conviction for driving while intoxicated. State v. Mechler, 123 S.W.3d 449,
453 (Tex. App.-Houston [14th Dist.] 2003), affirmed, 153 S.W.3d 435 (Tex. Crim. App.
2005). Testimony about the blood alcohol content at a later point in time can be, and is in
this case, admissible even without an expert to relate the blood alcohol findings back to the
time of the offense. Mechler, 153 S.W.3d at 440. Based on the record in this case, we can
say with confidence that Merkord's retrograde extrapolation testimony did not influence the
jury, or had but slight effect. 

 In summary, we overrule Morris's fifth issue because we hold Merkord's retrograde
extrapolation evidence was admissible; or, alternatively, we would overrule Morris's fifth
issue because the admission of Merkord's testimony was not harmful. 

Exclusion of Mark Epps's Testimony

 In his sixth point of error, Morris complains that the trial court erred in excluding the
testimony of Mark Epps concerning his conversation with Gary Carlin, the Wellcraft's other
occupant. According to Epps, Carlin said that "he was driving the boat, and he wasn't going
to go down for it." 

 Hearsay is generally not admissible unless its proponent demonstrates that the
proffered evidence meets a hearsay exception. See Tex. R. Evid. 802, 803. The Rules of
Evidence recognize an exception to the general rule of inadmissibility in criminal cases, and
provide that "a statement tending to expose the declarant to criminal liability is not
admissible unless corroborating circumstances clearly indicate the trustworthiness of the
statement." See Tex. R. Evid. 803(24). Thus, we look to the corroborating circumstances
surrounding Carlin's statement to Epps in determining its admissibility.

 The attorneys for both parties examined Epps outside the presence of the jury. 
According to Epps, he had known Carlin since 1997 and frequently drank with him after
work. Despite this testimony, Epps also testified that he did not care for Carlin. In 1999,
several months after the boating accident and several weeks prior to Carlin's death, Epps
testified that Carlin told him that he was driving the boat when the collision occurred. (8) 
Although they usually drank with others, no one else was present at the time of this alleged
statement. Epps also admitted that although he did not know Morris at that time, he was
aware that someone had been convicted for a criminal offense because of the collision, but
despite this knowledge, he never came forward and related to anyone in authority his
conversation with Carlin. 

 The circumstances surrounding the discovery of Epps as a potential witness is also
contained in the record. Epps testified that in 2004 he was standing in a bar when he
overheard a person mention the boat collision. That person was Morris, and at that point,
Epps told Morris about his 1999 conversation with Carlin. Epps testified that he did not
know Morris prior to that time. The trial court refused to allow Epps to testify regarding
Carlin's statement, and stated: 

 Well, it's not admitted for a myriad of reasons, including under Davis v. State[,
872 S.W.2d 743 (Tex. Crim. App. 1994)]. I've done this evaluation that the
Court talks about under these statements against interests. And while the
appellate court, if they see this record, didn't get to see this witness, but he -
his appearance to the Court is not credible. The way he approached his answer
in questions is not credible. His relationship with the declarant, the animosity
between the two, the way it happened, the lack of spontaneity, the whole
trustworthiness factor of 803(24), I think it is, is not even close as far as the
Court is concerned. That will be excluded. 


The trial court further indicated its view that Epps's testimony would be repetitious and
redundant. 

 Morris contends that Carlin's statement was admissible as an admission against penal
interest, which is an exception to the hearsay rule. Morris argues that in determining to
exclude Epps's testimony about the conversation he had with Carlin, the trial court erred by
improperly weighing Epps's credibility. In support of his argument, Morris points to the 
Davis opinion that generally discusses factors that can be considered in evaluating the
admissibility of a statement against penal interest. In Davis, the Court states: 

 We conclude that no definitive test exists by which to gauge the
existence of corroborating circumstances for purposes of Rule 803(24). Any
number of factors may be considered in this inquiry, including whether the
guilt of the declarant is inconsistent with the guilt of the accused, whether the
declarant was so situated that he might have committed the crime, the timing
of the declaration and its spontaneity, the relationship between the declarant
and the party to whom the declaration was made, and the existence of
independent corroborating facts. Further, evidence which undermines the
reliability of the statement as well as evidence corroborating its trustworthiness
may be considered, so long as the court is careful not to engage in a weighing
of the credibility of the in-court witness. The burden lies with the party
seeking to admit the statement, and the test is not an easy one; the evidence
of corroborating circumstances must clearly indicate trustworthiness. 


Davis, 872 S.W.2d at 749 (citation omitted). The Davis Court also noted that "[t]he focus
of this inquiry is on verifying to the greatest extent possible the trustworthiness of the
statement so as to avoid the admissibility of a fabrication." Id. at 748 (footnote omitted). 

 In assessing the admissibility of a hearsay statement against penal interest, the Rules
of Evidence and precedent allow trial courts discretion in considering a statement's
trustworthiness. The trial court may consider evidence that undermines the reliability of the
statement as well as evidence corroborating its trustworthiness. Cunningham v. State, 877
S.W.2d 310, 312 (Tex. Crim. App.1994). Moreover, the burden is on the party offering the
statement to show that corroborating circumstances clearly indicate the trustworthiness of
the out-of-court statement. Tex. R. Evid. 803(24). 

 The record before us shows that the trial court's refusal to allow Epps to testify
regarding Carlin's statement was not solely based upon the trial court's assessment of Epps's
credibility. A trial court may examine all of the circumstances under which a statement
against penal interest is offered in order to minimize the possibility of admitting a fabrication
into evidence. 

 Specifically, in this case, it was proper for the trial court to consider that Carlin died
before Epps came forward as a witness, leaving Epps as the sole witness who could testify
about Carlin's statement to him. By testifying to Carlin's statement, Epps did not risk
Carlin's coming forward to contradict Epps's testimony. Second, it was appropriate for the
trial judge to take into account that Epps delayed coming forward despite his knowledge that
a person he believed to be innocent had been convicted as the operator of the boat involved
in the collision. Third, the absence of a close friendship between Epps and Carlin makes it
unlikely that Carlin would make the alleged admission against penal interest to Epps. Fourth,
the context of the entire statement made to Epps renders the contention that Carlin would
admit to a crime implausible. Carlin allegedly told Epps that he was not going to go to jail
for the collision, and in the same conversation admitted to Epps that he was both impaired
and driving the boat. From an objective standpoint, it is illogical that one who states he
intends to stay out of jail would in the same conversation admit to the elements of the crime. 
Fifth, the trial court could consider evidence that Carlin admitted to others that Morris was
driving at the time of the accident. This included testimony from Trooper Fountain and
Deputy Robert Turner that Carlin stated to them at various times that Morris was operating
the boat at the time of the collision. Sixth, the trial court could consider expert witness
testimony from Dr. Jay Kovar, a physician, and John Laughlin, a biomechanical engineer,
who opined that Morris's injuries were more consistent with his being the boat's driver.

 Against these factors, the trial judge had to consider and weigh evidence tending to
corroborate Carlin's statement. This evidence included the testimony of Amy Pinkerton, an
insurance adjuster, who spoke to Carlin within six months after the collision. Pinkerton
testified to a conversation with Carlin in which he said that he was driving the boat. The jury
also heard the testimony of Tamara Clement, who testified that she came to Carlin's home
at his request after the collision to help care for his dogs, and while there, talked with him
about the collision. During that conversation, Carlin told her that "I didn't see the lights
before I hit the boat." Clement testified that she took Carlin's statement to mean that he was
driving the boat. Morris also had a biomedical engineering expert, Dr. James Ziegler, who
provided accident reconstruction testimony in support of his contention that he was not
driving. 

 Whether a trial court abuses its discretion in excluding evidence is tested by
evaluating whether the trial court's action was arbitrary or unreasonable. Manning v. State,
114 S.W.3d 922, 926 (Tex. Crim. App. 2003). We uphold a trial court's ruling if it is
"reasonably supported by the record and is correct under any theory of law applicable to the
case." Carrasco, 154 S.W.3d at 129. 

 In this case, the trial judge was aware of the applicable rule of evidence, and of the
relevant standards for admitting and excluding a hearsay statement against penal interest. 
Because a trial court may consider other indicia of trustworthiness, both positive and
negative, in making a decision to admit or exclude a hearsay statement against penal interest,
the weight the trial court accords such other indicia is largely discretionary. We would
reverse a trial court's exclusion of evidence only if the proponent of the hearsay evidence
demonstrated on appeal that the trial judge's conclusion was arbitrary or unreasonable. Tex.
R. Evid. 803 (24). 

 Morris, as the proponent of the evidence, bore the burden of clearly corroborating
Carlin's statement to Epps. Morris does not point to the evidence in the record sufficient to
meet his burden under the Rules of Evidence. The trial court's decision to exclude Epps's
testimony, although within the zone of reasonable disagreement, was also within its
discretion. We conclude that the trial court's decision was not arbitrary or unreasonable.
Having found no error in the trial court's exclusion of Epps's testimony, we overrule
Morris's sixth issue. Exclusion of Additional Testimony Regarding Gary Carlin

 In issue seven, Morris complains of the trial court's exclusion of Tamara Clement's
testimony that Carlin told her that "I will not go back to prison." In issues eight through ten,
Morris complains of three evidentiary rulings, to be addressed below, that prevented the jury
from hearing evidence regarding Carlin's prior conviction for manslaughter. 

At trial, Morris stated that he wanted to offer Carlin's statement about not going back
to prison to show Carlin's motive in accusing Morris of driving the boat. Although Morris
did not cite the rule number of the hearsay exception upon which he relied at trial, from the
context of the argument before the trial court it is apparent that Morris claimed that Carlin's
hearsay statement was admissible under Rule 803 (3) as a then existing mental, emotional,
or physical condition. Tex. R. Evid. 803 (3). (9) On appeal, Morris does not cite any hearsay
exception at all, but argues generally that evidence regarding a witness's bias is admissible. 
A trial court's decision to limit a witness's examination is reviewed on appeal under an abuse
of discretion standard. Love v. State, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993). An
abuse of discretion occurs when the trial court acts without reference to any guiding rules or
principles. Montgomery v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

The Confrontation Clause of the U.S. Constitution guarantees a defendant the right
to cross-examine witnesses. See U.S. Const. amend. VI; Delaware v. Van Arsdall, 475 U.S.
673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). In Carroll v. State, 916 S.W.2d 494, 497
(Tex. Crim. App. 1996), the Court of Criminal Appeals stated that the defendant may be
cross-examined on any subject "reasonably calculated to expose a motive, bias or interest for
the witness to testify." 

However, a trial court may impose some limits on a party's examination related to a
witness's bias, and the parameters of the cross-examination allowed are within the trial
court's discretion. McDuff v. State, 939 S.W.2d 607, 618 (Tex. Crim. App. 1997). The trial
court retains discretion to limit the scope of cross-examination to avoid harassment,
prejudice, confusion of the issues, endangering the witness, and the injection of cumulative
or collateral evidence. Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1435; Stults v. State, 23
S.W.3d 198, 204 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). These limitations do
not violate the defendant's "right to confront a witness as long as (1) the possible bias and
motive of the State's witness is clear to the trier of fact and (2) the accused has otherwise
been afforded an opportunity for a thorough and effective cross-examination." Stults, 23
S.W.3d at 204. Courts must examine each case on an individual basis to determine whether
the Confrontation Clause demands the admissibility of certain evidence. Lopez v. State, 18
S.W.3d 220, 225 (Tex. Crim. App. 2000). In making this determination, the court should
balance the probative value of the evidence sought to be introduced against the risk its
admission may entail. Id. at 222.

Based upon the trial court's ruling that evidence of Carlin's prior criminal acts was
inadmissible, the trial court's reluctance to allow Clement to testify about Carlin's statement
that he did not want to go back to jail is consistent with the court's desire to exclude the
evidence of Carlin's prior convictions. The trial court's stated reasons for excluding this
portion of Clement's testimony was that its probative value was outweighed by its prejudicial
impact, it confused the issues, and the statement was not shown to be sufficiently
trustworthy. 

Morris's request to recall Clement to put into evidence this portion of Carlin's
statement occurred near the end of the trial, after Clement had testified before the jury that
Carlin left her with the impression that he was driving the boat, and immediately after the
State called Deputy Turner, who testified that Carlin told him three times that Morris was
driving the boat. At that point in the trial, it was clear to the jury that both Carlin and Morris
had been drinking all day, that one of them was operating the boat at the time of the collision,
and that whoever was operating the boat would likely face charges for intoxication
manslaughter. Thus, even absent the admission of motive by Carlin, it was clear to the jury
that each had a motive to claim the other was driving. 

Because Carlin's motive to blame Morris was clear, and because Morris's
examination of Clement was not otherwise limited by the trial court, we find that Morris's
confrontation rights to present his theory were not meaningfully restricted by excluding the
proffered testimony of Clement. We hold that it was not an abuse of discretion by the trial
court to limit appellant's examination of Clement, and accordingly, overrule appellant's
seventh issue.

Exclusion of Carlin's Felony ConvictionIn his eighth, ninth, and tenth issues, Morris complains of the trial court's refusal to
allow him to use Carlin's November 11, 1987 conviction for voluntary manslaughter. In
issue eight, Morris complains that he should have been able to use the conviction during his
cross-examination of Trooper Fountain. In issue nine, Morris complains that he should have
been able to use the conviction in his cross-examination of Deputy Turner. In issue ten,
Morris complains of the trial court's refusal to admit into evidence certified copies of the
opinion affirming Carlin's manslaughter conviction. The trial court excluded the evidence
on the basis that its prejudicial impact far outweighed is probative value. See Tex. R. Evid.
403. Morris recognizes in his brief that a trial court's decision to exclude evidence is
reviewed under an abuse-of-discretion standard. 

We first note the context of Carlin's testimony. Carlin and Morris were the only
persons who knew who drove the boat at the time of the collision. Unfortunately, Carlin died
prior to the trial. As a result, Carlin's testimony regarding the events that came into evidence
at the trial consisted of Carlin's statements made to others. These statements were admitted
during the examinations of Trooper Fountain, Deputy Turner, Tamara Clement and Amy
Pinkerton. Under the Texas Rules of Evidence, once a trial court admits a hearsay statement,
a declarant's credibility can be attacked. Tex. R. Evid. 806. With respect to attacking a
witness's credibility, Rule 609 allows a witness to be impeached by evidence of a prior
felony, but also requires the trial court to determine that the probative value of the evidence
outweighs its prejudicial effect to a party. Tex. R. Evid. 609(a).

Moreover, a party's ability to use a conviction for impeachment of the witness's
credibility is not without limitation. Rule 609 also provides that "[e]vidence of a conviction
under this rule is not admissible if a period of more than ten years has elapsed since the date
of the conviction or of the release of the witness from the confinement imposed for that
conviction, whichever is the later date. . . ." Id. Morris acknowledges in his brief that
Carlin's conviction was more than ten years old, but then states, "Carlin's release from prison
was not." The record and the documents that Morris tendered to the trial court regarding
Carlin's conviction did not establish Carlin's release date from prison, or show that his
release was less than ten years prior to Morris's trial. 

Because there is no evidence regarding the date on which Carlin was released from
confinement, and because his manslaughter conviction was more than ten years old, the trial
judge could properly exclude the manslaughter conviction from being admitted before the
jury. Tex. R. Evid. 609(b). We hold that the trial court did not abuse its discretion in
refusing to allow evidence concerning Carlin's conviction of manslaughter.

Nevertheless, even if we were to conclude Carlin's release fell within the ten-year
window under the Rule, the trial judge must still balance the probative value of the
conviction against its prejudicial effect. Theus v. State, 845 S.W.2d 874, 880 (Tex. Crim.
App. 1992). In balancing the probative value of a prior conviction against its prejudicial
effect, the factors that a court may consider include the impeachment value of the prior
conviction, the passage of time between the prior conviction and the present matter, the
similarity of the two offenses, the importance of the witness's testimony, and the importance
of the witness's credibility. Id. at 880-81. Under the circumstances in this case, the trial
court's decision to exclude the evidence of Carlin's prior manslaughter conviction would still
lie within its discretion. The impeachment value of the evidence was not significant. The 
four witnesses who testified regarding Carlin's statements about who was driving at the time
of the collision conflicted. Because Carlin told different witnesses different versions of who
was driving the boat, Carlin's credibility with the jury was likely already low. 

The passage of time between the conviction and the trial is also relevant. Carlin's
conviction occurred approximately fourteen years prior to Morris's trial. The temporal
proximity between the conviction and Morris's trial are factors favoring the trial court's
conclusion to exclude the conviction. 

A comparison of the crimes in issue is also relevant. The crime for which Carlin was
convicted, manslaughter, arose out of Carlin's violent conduct, and not from conduct tending
to show that Carlin was not a truthful person. Voluntary manslaughter is a crime of violence,
not a crime of deception. See Deleon v. State, 126 S.W.3d 210, 215 (Tex. App.- Houston
[1st Dist.] 2003, pet. dism'd). Thus, this factor likewise favored the trial court's ruling. 

Because a jury might use the conviction improperly, there was a potential danger of
confusion. Rule 404(b) prohibits "[e]vidence of other crimes, wrongs or acts . . . to prove
the character of a person in order to show action in conformity therewith." Tex. R. Evid.
404(b). It was appropriate for the trial court to consider whether a jury might improperly
consider Carlin's criminal conviction as some evidence that Carlin was more likely than
Morris to have committed the offense for which Morris was on trial. The use of the evidence
in this manner would be inappropriate under Rule 404. Because this potential misuse
existed, the trial court could properly weigh it in determining to exclude the conviction.

Additionally, Carlin's conflicting testimony was not very important to the jury in
resolving the case. Carlin died prior to trial and did not testify. There was substantial
circumstantial testimony and expert testimony for the jury to utilize in resolving whether
Carlin or Morris drove the boat at the time of the collision. Carlin's two different accounts
regarding who was driving were diametrically opposed. It is unlikely that the jury relied on
his testimony in resolving the issue against Morris. 

In summary, Carlin's conviction was not shown to be admissible as it was more than
ten years old. Even had it been admissible, after applying the applicable factors, we conclude
that Carlin's 1987 manslaughter conviction had very little probative value concerning
Carlin's credibility. We also conclude that the prejudicial value was significant, as the
admission of the evidence had the potential to confuse the jury. We find no error in the trial
court's rulings to exclude information about Carlin's prior manslaughter conviction, and
overrule issues eight, nine and ten.

Cumulation of Sentences

The jury convicted Morris of three counts of intoxication manslaughter and sentenced
him to eighteen years on each conviction. When a defendant is convicted on multiple counts
of intoxication manslaughter, the trial court has authority to cumulate the sentences or have
them run concurrently. Tex. Code Crim. Proc. Ann. art. 42.08 (Vernon Supp. 2006). 

Instead of making Morris's sentence concurrent or consecutive, the trial court ordered
Morris's sentences to run partially concurrent and partially consecutive, stating:

Six years of the 18-year sentence in Cause No. 00-06-03646-CR, Count III,
410th District Court, Montgomery County, Texas, shall run concurrent with
Cause No. 00-06-03646-CR, Count II, 410th District Court, Montgomery
County, Texas; and the remaining 12 years shall run consecutive to the
sentence in Cause No. 00-06-03646-CR, Count II, 410th District Court,
Montgomery County, Texas. 


At the sentencing hearing the trial court stated, "The Record should be very clear, in the
event there is a challenge as to whether I can do what I'm doing, if I can't it's consecutive
for 54 years." 

 The question before us is whether the trial court has the discretion to partially
cumulate multiple sentences. With respect to cumulating convictions for multiple crimes
arising out of the same criminal episode, the Texas Penal Code provides: (a) When the accused is found guilty of more than one offense arising out of the
same criminal episode prosecuted in a single criminal action, a sentence for
each offense for which he has been found guilty shall be pronounced. Except
as provided by Subsection (b), the sentences shall run concurrently. 


(b) If the accused is found guilty of more than one offense arising out of the
same criminal episode, the sentences may run concurrently or consecutively if
each sentence is for a conviction of. . .an offense . . . under Section 49.08. . . .

 

Tex. Penal Code Ann. § 3.03(a), (b)(1)(A) (Vernon Supp. 2006). (10) 


The Code of Criminal Procedure provides:

When the same defendant has been convicted in two or more cases, judgment
and sentence shall be pronounced in each case in the same manner as if there
had been but one conviction. Except as provided by Sections (b) and (c) of
this article, in the discretion of the court, the judgment in the second and
subsequent convictions may either be that the sentence imposed or suspended
shall begin when the judgment and the sentence imposed or suspended in the
preceding conviction has ceased to operate, or that the sentence imposed or
suspended shall run concurrently with the other case or cases, and sentence and
execution shall be accordingly . . . . 

Tex. Code Crim. Proc. Ann. art. 42.08(a) (Vernon Supp. 2006). (11) 

 The issue now before us was resolved in Ex parte Sadler, 283 S.W.2d 235 (Tex. Crim.
App. 1955). In reviewing article 774 of the Code of Criminal Procedure, the statute from
which article 42.08 is derived, the Court of Criminal Appeals held that a trial court was
without authority to partially cumulate two twenty-five year sentences to require the
defendant to serve thirty-five years in jail. Id. at 237. As Article 42.08 is not materially
different than Article 774, we conclude that the holding in Sadler prohibits trial courts from
partially cumulating criminal sentences. 

 We find the trial court erred by entering cumulation orders that partially cumulated
Morris's sentences with respect to his convictions on Count II and Count III. The trial
court's orders cumulating Count II and Count III are set aside. We reform the judgment so
that Morris's sentence on Count III runs concurrently with his sentence on Count II. See
Tex. R. App. P. 43.2(b); Bigley v. State, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993) (en
banc); Ex parte Muse, 155 Tex. Crim. 186, 233 S.W.2d 125 (Tex. Crim. App. 1950). The
trial court's order cumulating Count II and Count I is affirmed. We affirm the judgments of
conviction on Morris's three separate counts of intoxication manslaughter. As reformed, the
trial court's judgment is affirmed.

 AFFIRMED AS REFORMED.


 ____________________________

 HOLLIS HORTON

 Justice


Submitted on September 21, 2006

Opinion Delivered January 17, 2007

Publish


Before McKeithen, C.J., Gaultney, and Horton, JJ.
1. The legislature amended section 49.08 of the Penal Code after the commission of the
alleged offense. However, we cite to the current version of this section because the
amendment does not change its substance as applied here. Under the version of section 49.01
of the Penal Code in effect at the time of this offense, "Intoxicated" is defined in two ways;
either, as "not having the normal use of mental or physical faculties by reason of the
introduction of alcohol . . .;" or as "having an alcohol concentration of 0.10 or more." Act
of May 29, 1993, 73rd Leg., R.S., ch. 900, § 49.01(2), 1993 Tex. Gen. Laws 3696 (current
version at Tex. Pen. Code Ann. § 49.01(2) (Vernon 2003) (lowering the "per se"
intoxication level from 0.10 to 0.08). At a 0.10% blood alcohol level, a person has a
concentration of 100 mg of alcohol per 100 ml of blood. State v. Mechler, 153 S.W.3d 435,
445 (Tex. Crim. App. 2005) (Cochran, J., concurring). The indictment alleged both an
impairment theory of intoxication and a "per se" theory of intoxication. Based on the date
of the offense, the State was required to prove that Morris operated a watercraft while
intoxicated by having an alcohol concentration of 0.10 or more to prove its "per se" theory.
2. In September 2000, Morris initiated the proceedings to determine his competency by
filing a motion for a competency hearing. [2 CR 281 First Trial 09-00-477CR] The
legislature amended Texas's statutes concerning incompetency, but there were no changes
in the statutory presumption of competence or the statute's placement of the burden of proof. 
Compare Act of May 19, 1999, 76th Leg., R.S. ch. 561 § 1, 1999 Tex. Gen. Laws 3093 with
current version at Tex. Code Crim. Proc. Ann. art. 46B.003(b) (Vernon Supp. 2006). 
Therefore, citations are to the current version of the statute.
3. The prior statute with respect to this provision is identical. Compare Act of May 26,
1999, 76th Leg., R.S. ch. 561 § 1, 1999 Tex. Gen. Laws 3092 with current version at Tex.
Code Crim. Proc. Ann. art. 46B.003(a) (Vernon Supp. 2006).
4. The Inland Navigation Rules were effective at the time of the collision. However,
they subsequently have been repealed, effective on the effective date of final regulations
prescribed under 33 U.S.C.A. § 2071. Pub. L. No. 108-293, Title III, § 303(a)(c), 118 Stat.
1042 (2004).
5. Harrison's calculation utilizes a definition of "CV" as the absolute value of the
difference from the mean divided by the mean, compares the values only within each column,
and does not calculate the value between the two runs on August 13 and August 16. 
Harrison's definition of "CV" varies from the common definition of coefficient of variation. 
The portions of the DPS's lab manual explaining how the lab analyzes blood specimens
contain no definition of the term "CV". 
6. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d
469 (1993); Kelly v. State, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992) (stating that the
appellate court must determine whether the trial court's decision was "within the zone of
reasonable disagreement" given the evidence presented at the suppression hearing and given
the requirements of Texas Rule of Evidence 702.) 


 
7. At the time of the incident, Ross was employed by Inland Marina and had specific
knowledge about the Wellcraft and its history of owners. 
8. Neither party disputes that Carlin's statement to Epps was hearsay. It was an out of
court statement offered to prove that Carlin, and not Morris, committed the charged offense. 
See Tex. R. Evid. 801(d), 802. Although not argued by the State, we also note that a
statement that one drove a boat involved in an accident, standing alone, is not a statement
against one's penal interest. There is no criminal penalty that attaches to the act of driving
a boat involved in an accident. Also, the record before us contains no evidence to prove that
Carlin's post-collision blood alcohol level exceeded the 0.10 "per se" standard. However,
the record does contain testimony about Carlin's drinking during the day, and testimony 
showing conduct that was circumstantial of his intoxication before leaving Del Lago's dock. 
Also, included in Carlin's statement to Epps is Carlin's additional admission that his drinking
caused impairment to his normal control over his faculties. Thus, the testimony is sufficient
to show that a reasonable person would be concerned about the potential criminal
implications of making such a statement. For purposes of this appeal, we assume that
Carlin's statement to Epps was a statement that he made against his penal interest.
9. "The following are not excluded by the hearsay rule, even though the declarant is
available as a witness: . . . (3) Then Existing Mental, Emotional, or Physical
Condition. A statement of the [] existing state of mind, emotion, sensation, or physical
condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but
not including a statement of memory or belief to prove the fact remembered or believed
unless it relates to the execution, revocation, identification, or terms of declarant's will." 
Tex. R. Evid. 803(3). 
10. The current version of the statute is cited, as there are no material changes in the
amended statute with respect to sentences arising from violations of article 49.08 of the Penal
Code. 
11. This provision was derived from the 1925 Code of Criminal Procedure, Article
774 of the Revised Criminal Statutes, which provided: 

 

 When the same defendant has been convicted in two or more cases, and the
punishment assessed in each case is confinement in the penitentiary or the
jail for a term of imprisonment, judgment and sentence shall be pronounced
in each case in the same manner as if there had been but one conviction,
except that in the discretion of the court, the judgment in the second and
subsequent convictions may either be that the punishment shall begin when
the judgment and sentence in the preceding conviction has ceased to operate,
or that the punishment shall run concurrently with the other case or cases,
and sentence and execution shall be accordingly. 


Code of Criminal Procedure of the State of Texas, 39th Leg., R.S., Ch. 3, art. 774, 1925
Tex. Gen. Laws, reprinted in A.C. Baldwin; Revised Crim. Statutes, 1925, at 120
(Austin, A.C. Baldwin & Sons 1925), repealed and recodified by Act of May 27, 1965,
59th Leg., R.S., Ch. 722, 1965 Tex. Gen. Laws 486.