

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0240-07

**REGINALD EUGENE MORRIS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S AND STATE'S PETITIONS
### FOR DISCRETIONARY REVIEW
### FROM THE NINTH COURT OF APPEALS
### MONTGOMERY COUNTY

COCHRAN, J., delivered the opinion of the Court, in which WOMACK, JOHNSON, KEASLER, HERVEY, and HOLCOMB, JJ., joined. PRICE, J., filed a dissenting opinion. KELLER, P.J., filed a concurring and dissenting opinion in which MEYERS, J., joined.

### OPINION

Appellant's high-speed boat collided with a cabin cruiser on Lake Conroe, killing two adults and a baby. A jury convicted appellant of three counts of intoxication manslaughter. The court of appeals found that the competency jury's verdict that appellant, who claimed amnesia concerning the boat accident, was competent to stand trial was not against the great weight and preponderance

of the evidence.[1]  We granted both appellant's and the State's petitions for discretionary review to 1) revisit *Jackson v. State,* a prior opinion addressing the relevance of amnesia to a claim of incompetency, and 2) address the appropriate remedy for an unlawful, partially stacked sentence.[2] We affirm the court of appeals.

## I.

### A.    The accident.

On July 17, 1999, appellant and Gary Carlin spent the day drinking and boating on Lake Conroe in appellant's 23-foot Wellcraft speedboat.  Douglas Cox, who was also out boating that day, ran into appellant at a lakeside bar in the late afternoon.  Later, they drove their boats over to the Del Lago Marina to continue drinking.  Sometime after 9:00 p.m., the three men walked down to the boat dock.  As Cox drove his boat off, he glanced back and saw a bright spotlight coming from appellant's Wellcraft, shining up at the marina hotel.

---

[1] *Morris v. State*, 214 S.W.3d 159 (Tex. App.—Beaumont 2007).

[2] Appellant's issues are
(1)    The court of appeals erred in reforming the trial court's stacking order rather than vacating it in its entirety, and
(2)    The court of appeals decision concerning appellant's competency to stand trial conflicts with this court's decisions in *Jackson v. State*, 548 S.W.2d 685 (Tex. Crim. App. 1977), *Casey v. State*, 924 S.W.2d 946 (Tex. Crim. App. 1996) and *Meraz v. State*, 785 S.W.2d 146 (Tex. Crim. App. 1990).
The State's issues are
(1)    Should *Jackson v. State*, 548 S.W.2d 685 (Tex. Crim. App. 1977), be overruled in part because the review of the sufficiency of the evidence in support of a competency jury's verdict should be restricted to the evidence before the jury?, and
(2)    If a trial court pronounces a legal alternative ruling on the cumulation of sentences, should a court of appeals reform the judgment contrary to that ruling?  In other words, should *Ex parte Sadler*, 283 S.W.2d 235 (Tex. Crim. App. 1955), be overruled with respect to its automatic reformation of a judgment to strike the erroneous cumulation order and run the sentences concurrently?

Brian Ross also saw the spotlight. Ross recognized the Wellcraft because he had worked on it before. He said that the light was being held by the driver who was the taller and thinner of the two men on the boat.[3] Ross said that the driver yelled out that they were "just looking for some pussy." The driver revved the engine, idled out of the marina, and then the boat "took off at a very high RPM, very fast, what I would consider fast throttle."

Tim Tremeer, who was fishing on the lakeshore, said that he could hear a boat traveling from Del Lago to the main body of the lake "at a high rate of speed . . . over 70 miles an hour." Tremeer noted the boat did not have its aft lights up. He told his fishing partners, "he's going to hit somebody or kill somebody." Treemer lost sight of the boat, but he shortly heard a violent collision–fiberglass on fiberglass. Treemer called 911.

Dennis Norman, who was fishing from his 28-foot pontoon boat, likewise heard the accident:

First thing I noticed before the accident was, I heard what I would call a speed boat, jet boat, or whatever start up its motor; and it was in a distance, but we could tell that it was–it was running pretty fast. It sounded like it was wide open. It was so wide open for what, from 30 seconds to a minute; and then we heard some kind of a crash, collision.

The Wellcraft had run into the hull of the "Julie V," Fred Hart's 30-foot Bayliner cabin cruiser. There were six people on the Bayliner–Hart; his wife Julia; Julia's daughter, Jewel; Jewel's boyfriend, Kenneth; Julia's other daughter, Lonnie; and Lonnie's baby son, Joseph. Julia had seen the Wellcraft just before impact, and Fred saw it "coming toward us from about 2:00 o'clock. A no-miss angle."

Dennis Norman, who arrived within minutes, said the first thing he saw was "two boats sitting in the water. One boat was turned one way and the other boat was jammed into the side of

---

[3] Carlin was described as shorter and stockier than the "good-sized" appellant.

it. I saw people in the water. I saw mass confusion. There was just a ton of people in the water." Dennis tied his pontoon boat up next to the Julie V and "started pulling passengers in." The "cigarette boat was sinking," so his brother crossed to that boat to bring those two people in.

Appellant was unconscious, with the side of his face stuck in the windshield just to the left of the steering wheel. Carlin was behind him, asking for help to get appellant off the boat. Appellant regained consciousness and was belligerent. The Norman brothers "had to manhandle him" to get him to the pontoon boat. He "was obviously drunk. His face was real messed up." Carlin, who was in better shape, helped move appellant. The Wellcraft sank less than five minutes later.

When the Vessel Assist arrived, the injured were moved to that boat. Dennis Norman said appellant was again uncooperative.

> When I stood him up, I wrapped my arms around him and stood him up; and I said, "[W]e've already unloaded everybody onto the Vessel Assist. They need to get to the hospital." And he was not cooperative. He says, "give me a second, man." I said, "[W]e don't have a second. We have people here dying on the other boat." And he said, "[J]ust chill." When he told me just to chill, I lost it, and I wrapped my arms around him, threw him into the other boat . . . .

Carlin was able to get on the Vessel Assist on his own, but then unsuccessfully tried to commandeer the boat in an effort to flee the scene. Jewel died of a "skull fracture, crushed chest and asphyxia due to drowning." Trapped in the cabin by the Wellcraft, Lonnie, who sustained a lacerated spleen and liver, and the baby, who sustained a skull fracture, died from their injuries and asphyxia due to drowning.

Appellant was transported to the Conroe Regional Medical Center emergency room, where he was listed in critical condition. The attending nurse said he was "very bloody and screaming and

was upset–well, highly upset and he was in pain. And I remember him telling me that he had his f---

-ing teeth in his hand and I took those from him out of his hand and put them in a jar for him and he

was just extremely upset." Both the nurse and doctor noted that appellant smelled very strongly of

alcohol. Appellant said "he wasn't f---ing driving" multiple times. He told a trooper that a woman

had been driving the Wellcraft, and she had jumped overboard. Appellant had facial injuries, a

broken jaw, multiple missing teeth, a lacerated lower lip, multiple contusions across his chest, a

ruptured lung and a closed head injury. He had a BAC of .198 at 11:00 p.m. and .180 at midnight.

Carlin was also taken to the E.R. He had a cut brow and eyelid, cuts to his abdomen and leg,

and a lacerated liver. He repeatedly stated that appellant had been driving the boat.

**B.      The trial and appeal.**

After a competency jury had determined that appellant was competent to stand trial, a

separate jury was chosen for the trial on the merits. The two contested issues at trial were whether

appellant was intoxicated at the time of the collision, and whether appellant or Gary Carlin was

piloting the boat when it struck the cabin cruiser. Midway through the trial, the parties agreed and

stipulated to following fact: "As a result of the injuries sustained during the incident on July 17,

1999, Reginald Eugene Morris has no memory of the events of that day after leaving Del Lago."

Evidence that appellant had been at the wheel included the following:

(1)      Appellant's civil deposition testimony that the Wellcraft was his and that he would
not have let Carlin drive it in the dark;

(2)      Brian Ross's testimony that the Wellcraft left Del Lago shortly before the accident
with the taller and thinner of the two occupants (appellant) driving;

(3)      The Norman brothers' testimony that appellant was found unconscious near the
Wellcraft's steering wheel;

(4)    The E.R. doctor's testimony that appellant's injuries were consistent with having hit the steering wheel, while Carlin's were not;

(5)    Testimony that some of appellant's teeth were found under the driver's seat of the Wellcraft, directly under the steering wheel; and

(6)    The State's reconstruction expert's opinion that appellant was driving the boat.

The State's evidence that appellant was intoxicated included appellant's admission that he was "a little drunk," eyewitness testimony that he was "obviously" drunk, and BAC tests putting him at nearly twice over the then-legal limit.

Evidence that supported the defense theory that Carlin had been behind the wheel included the following:

(1)    The defense reconstruction expert's opinion that Carlin was in the driver's seat;

(2)    Appellant's prior statement that he had made a conscious decision not to drive the boat that night because he had had too much to drink;

(3)    Testimony that appellant was shirtless at Del Lago (coupled with Ross's testimony that the driver had a T-shirt on);

(4)    Insurance adjuster Amy Pinkerton's deposition testimony that Carlin said "He had been driving a boat on Lake Conroe that had been in an accident and killed a family or killed some people.";[4]

(5)    Tarmar Clement's testimony that Carlin told her, "I didn't see the lights before I hit the boat."; and

(6)    Testimony that Carlin had attempted to take over the Vessel Assist boat and drive it away from the scene of the accident.

The defense noted that much of appellant's apparently drunken behavior was consistent with that of someone with a head injury. It also vehemently challenged the State's blood-alcohol evidence. Ultimately the jury credited the State's witnesses, convicted appellant on all three

---

[4] Carlin died before the trial began.

manslaughter counts, and assessed his sentence at 18 years on each count. The trial judge stacked the first two sentences and 12 years of the third, achieving a 48-year sentence. The judge stated, "The Record should be very clear, in the event there is a challenge as to whether I can do what I'm doing, if I can't it's consecutive for 54 years."

In affirming the conviction and reforming the sentence, the court of appeals held the following: (1) the competency jury was entitled to credit the State's experts' opinions that appellant was competent, and its verdict was not against the great weight and preponderance of the evidence in light of that testimony; (2) the competency jury's verdict was not against the great weight and preponderance of the evidence because it was possible to determine retrospectively that appellant's amnesia did not, under *Jackson v. State*,[5] deprive him of a fair trial; and (3) under *Ex parte Sadler*,[6] the trial judge erred in partially cumulating count III, so it reformed the stacking order to show that count III runs concurrent with count II.

We granted review to examine the court of appeals's application of *Jackson*, and its reformation of the sentence.

**II.**

A.      **Review of the sufficiency of the evidence to support a competency jury's verdict should be restricted to the evidence before the competency jury, even when the incompetency claim is based on amnesia.**

Appellant asserted that he was incompetent to stand trial because the traumatic brain injury he sustained during the boat accident caused him to have no memory of that event. After a preliminary hearing, the trial court found that appellant's amnesia triggered a right to a competency

---

[5] 548 S.W.2d 685 (Tex. Crim. App. 1977).

[6] 283 S.W.2d 235 (Tex. Crim. App. 1955).

jury trial.[7] That jury's task was to decide if appellant, who is presumed to be competent, proved his incompetency by a preponderance of the evidence.[8]

*1.    The legal standard for determining competency.*

A person is incompetent to stand trial if the person does not have: "(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person."[9] Evidence relevant to these issues includes whether a defendant can (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.[10]  As the Supreme Court stated in *Cooper v. Oklahoma*, "'Competence to

---

[7] TEX. CODE CRIM. PROC. arts. 46B.051 through 46B.055.

[8] TEX. CODE CRIM. PROC. art. 46B.003(b).

[9] TEX. CODE CRIM. PROC. art. 46B.003(a).  This is the Supreme Court's "*Dusky* standard."  *Dusky v. United States*, 362 U.S. 402 (1960); *Godinez v. Moran*, 509 U.S. 389 (1993).  The underlying rationales behind *Dusky* are: safeguarding accuracy and reliability of the trial; enhancing fairness of the criminal process; maintaining the "dignity" of the trial process; and making punishment more just.  Wayne R. LaFave & Austin W. Scott, Jr., SUBSTANTIVE CRIMINAL LAW 4.4(a) (2d ed. 1986) (citing Note, *Incompetency to Stand Trial*, 81 HARV. L. REV. 454, 457-59 (1967-1968)).

[10] *See* TEX. CODE CRIM. PROC. art. 46B.024 Factors Considered in Examination During an examination under this subchapter and in any report based on that examination, an expert shall consider, in addition to other issues determined relevant by the expert, the following:
(1) the capacity of the defendant during criminal proceedings to: (A) rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings; (B) disclose to counsel pertinent facts, events, and states of mind; © engage in a reasoned choice of legal strategies and options; (D) understand the adversarial nature of criminal proceedings; (E) exhibit

stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair

trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to

cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without

---

appropriate courtroom behavior; and (F) testify;
(2) whether the defendant has a diagnosable mental illness or is a person with mental retardation;
(3) the impact of the mental illness or mental retardation, if existent, on the defendant's capacity to engage with counsel in a reasonable and rational manner; and
(4) if the defendant is taking psychoactive or other medication: (A) whether the medication is necessary to maintain the defendant's competency; and (B) the effect, if any, of the medication on the defendant's appearance, demeanor, or ability to participate in the proceedings.

Evidence relating to these statutory factors may be considered by the fact-finder as they are relevant to its 46B.003(a) decision. *See Hart v. State,* 173 S.W.3d 131, 140 (Tex. App.—Texarkana 2005, no pet.) (trial court properly denied request to charge the jury on the elements listed in article 46B.024; "Defense counsel's requested instruction contains factors set out by the statute as being necessary for the expert to consider in making his or her determination. Those factors were subject to questioning of the experts at the hearing, but that does not necessarily translate into factors that must be individually presented to the jury in the charge. There is no authority requiring those factors to be separately sent to the jury, and they are on their face factors directed at the expert for use in the expert's evaluation."). *See also Sims v. State*, 614 S.E.2d 73, 77 (Ga. 2005) ("The factors to consider in determining a defendant's capability to assist in his defense include whether the defendant can adequately consult with others, knows the names and functions of those involved with the case, and reasonably understands the rules, the specific charges, the penalties and the consequences of the proceedings."); *State v. Snyder*, 750 So. 2d 832, 852 (La. 1999) ("The facts to consider in determining a defendant's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial."), *rev'd on other grounds by Snyder v. Louisiana*, 552 U.S. 472 (2008).

penalty for doing so.'"[11]   A defendant's competency to stand trial is a question of fact to be determined by the competency jury.[12]

*2.      The competency jury trial.*

At the competency trial, appellant contended that he had no memory from a period of approximately thirty minutes before the accident until four days later.  This amnesia interfered with his ability to consult with his attorney and prevented him from having a factual understanding of the proceedings against him because he could not disclose pertinent facts and events to his attorney.

The experts for both the State and defense agreed that appellant had suffered "a profound head injury" and "traumatic brain injury" and that it is common for such an injury to cause retrograde amnesia–an inability to retain memory of events covering a period of time just before the injury.[13] The experts disagreed, however, on the effect of a defendant's amnesia to his competency to stand trial.[14]

Dr. Steven Rosenblatt, a board-certified psychiatrist, testified that he had reviewed appellant's medical records and interviewed him.  Dr. Rosenblatt said that appellant told him that,

---

[11] 517 U.S. 348, 354 (1996) (quoting *Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring in judgment)).

[12] *See People v. Palmer*, 31 P.3d 863, 865 (Colo. 2001).

[13] The State did not contest appellant's evidence at the competency hearing that he suffered retrograde amnesia as a result of his injuries from the collision.  Dr. Rosenblatt, for instance, acknowledged that he was unaware of any indications that the appellant was malingering.

[14] We are not asked to decide whether these medical experts' opinions concerning the legal standards by which to measure competency under Texas law were admissible under TEX. R. EVID. 702-705.  They may certainly give their opinions concerning the specific facts and factors set out in art. 46B.024, but the legal definition and standard by which competency is measured is a question of law, not defined by medical experts.

on the night in question, he made a conscious decision not to drive the boat because he had too much to drink and instead went to sleep in the aft area of the boat. Dr. Rosenblatt stated, "If we postulate that he is amnesic, he would have difficulty in refuting what [witnesses] might say." He would also have "great difficulty in testifying concerning what happened during that interval." However, it was Dr. Rosenblatt's opinion that any inability that appellant might have to recount the events during the "interval" did not render him incapable of consulting with his lawyers with a reasonable degree of rational understanding: Appellant was aware of the nature of the charges against him and the potential consequences of a trial, and even if he could not remember the accident itself, he could assist his attorneys by providing relevant information about the day of the accident.

Dr. Daneen Milam, a board-certified neuropsychologist, testified that she reviewed appellant's medical records, conducted a clinical interview of him, and also subjected him to a battery of psychological tests. She concluded that appellant, because he does not remember the events for which he is on trial, cannot satisfy the legal standard for competency to stand trial. She testified that appellant would have suffered amnesia from his head injury even if he had not been drinking at the time. Dr. Milam believed that, because of his amnesia, appellant was unable to disclose pertinent information to his attorneys about what happened at the moment of the offense, challenge the accounts of witnesses against him, or testify in his own behalf about the specific event that formed the basis of the charge against him.[15]

---

[15] A board-certified criminal defense attorney opined that a person who does not have the present ability to consult with his attorney concerning the pertinent facts for which he is charged is not competent to stand trial "unless there is no question from independent sources about what happened." "If he doesn't remember what happened, I don't think he can consult with his attorney." That attorney acknowledged that a defendant who could not remember the facts of the offense because he was either drunk or asleep at the time would not be incompetent to stand trial.

Dr. Walter Quijano, a clinical and forensic psychologist, also testified. He said that amnesia alone does not justify a finding of incompetency and that, "[if] the person has amnesia, then one is to determine if the case against him can be reconstructed by witnesses, physical evidence[.]" Dr. Quijano agreed that "[a]mnesia plus no eyewitness and conflicts in expert witnesses . . ., those things would render somebody incompetent[.]"[16]

The competency jury also heard from Sergeant Kenneth Henderson, who testified that the only potential eyewitnesses to the collision itself were the people on the two boats. Gary Carlin, the Wellcraft's other occupant and one of the potential witnesses, died in May 2000. Sgt. Henderson testified that none of the occupants of the Julie V could identify the Wellcraft's driver at the time of the collision, but he said that the identity of its driver could be determined by other evidence. Sgt. Henderson said that both State and defense experts examined the boat after it was recovered, and they came to "at least two different opinions . . . as a result of the examination."[17] Also, Debbie Cummings, appellant's lifetime partner, testified that he was unconscious for three to four days after the accident. Cummings related several incidents occurring long after the collision that showed

---

[16] Dr. Quijano said that appellant
> would be incompetent if there are no external data and only he can reconstruct it. Of course, he could not; but if it could be reconstructed from other sources, then he is not incompetent. Remember, the law says present ability to consult with his lawyer with a rational understanding. Not factual. It is rational understanding.

According to Dr. Quijano, if experts disagree on interpretation of outside data, then "it would be up to the trier of facts to decide." "If the trier of fact decides there is sufficient external data, then the person is competent in spite of amnesia. If the triers of facts decide that there is no sufficient reconstruction, then they – the amnesiac becomes incompetent."

[17] At trial, both sides presented reconstruction experts who gave their opinions, based on the wreckage of the boats and the injuries suffered, on who was driving appellant's boat at the moment of the collision. The State's experts said that appellant was driving; the defense experts had Carlin driving. The pre-trial competency jury did not hear any of these expert opinions, only that there was a difference of opinion among unnamed experts.

appellant continued to suffer from an ongoing short-term memory impairment.

The jury found that appellant had not established by a preponderance of the evidence that he was incompetent.

3.    *The court of appeals.*

On appeal, appellant relied on *Jackson v. State*[18] to support his claim that amnesia renders a defendant incompetent to stand trial.  In *Jackson*, we rejected the defendant's argument that his amnesia about the act of shooting his sister rendered him incompetent to stand trial.[19]  In that case, we applied–in a general sense–the factors set out in *Wilson v. United States*,[20] a federal District of Columbia case, in finding that "the evidence [was] sufficient to support the jury's verdict that appellant was competent to stand trial" and in concluding that Jackson's lack of memory of the shooting did not, in fact, deprive him of a fair trial.[21]  The *Wilson* factors to which this Court cited were: (1) the extent to which the amnesia affected the defendant's ability to assist his lawyer; (2) the extent to which the amnesia affected the defendant's ability to testify in his own behalf; (3) the extent to which the evidence could be extrinsically reconstructed; (4) the extent to which the State assisted the defendant and his attorney in that reconstruction; (5) the strength of the prosecutor's case

---

[18] 548 S.W.2d 685 (Tex. Crim. App. 1977).

[19] Jackson was prosecuted for voluntary manslaughter for killing his sister.  He testified that he was trying to scare his wife with a gun, and the gun "'hung' and it fired and his wife was hit."*Id.* at 692.  He said that he had no memory of the gun somehow discharging a second time, killing his sister.  At a pretrial competency hearing, a psychiatrist testified that the killing of Jackson's sister had been so "abnormal" to Jackson that he "could not understand it, and thus could not remember it."  *Id.* at 690.

[20] 391 F.2d 460 (D.C. Cir. 1968).

[21] *Jackson,* 548 S.W.2d at 692.

and whether the amnesia prevented the defendant from establishing an alibi or defense; and (6) other facts and circumstances affecting whether the defendant had a fair trial.[22]

The court of appeals in this case affirmed the competency jury's verdict. First, and without reference to *Jackson*, the court held that the competency jury was entitled to credit the opinions of the State's experts that the appellant was competent. In light of that testimony, the jury's verdict was not against the great weight and preponderance of the evidence.[23] Turning, alternatively, to the *Wilson* factors set out in *Jackson*, the court held that the jury's verdict was not against the great weight and preponderance of the evidence because, retrospectively, it was apparent that appellant's amnesia did not deprive him of a fair trial.[24]

4.    *The parties' arguments.*

In his petition, appellant claims that the jury's verdict that he was competent to stand trial was against the great weight and preponderance of the evidence when measured against the standard

---

[22] *Wilson*, 391 F.2d at 463-64. We note that the factors set out in *Wilson* bear some resemblance to the statutory factors set out in TEX. CODE CRIM. PROC. art. 46B.024(1). To the extent that they are inconsistent, we are bound to follow the more recent Texas statutory scheme.

[23] *Morris*, 214 S.W.3d at 167-68.

[24] *Id*. at 169 ("Having reviewed the trial transcripts from both trials relevant to Morris's competency claim, we find Morris's evidence does not establish that: (1) he was unable to consult with his attorney with a reasonable degree of rational understanding; (2) he did not have a rational understanding of the consequences of the proceedings against him; or (3) at the time of the trials he did not have a factual understanding of the basis of the State's claims. The jury's verdict rejecting Morris's claim of incompetency was not against the great weight and preponderance of the evidence."). The court referenced "both trials" because appellant was originally tried for these offenses in July 2000. *See Morris v. State*, No. 09-00-477 CR, 2002 Tex. App. LEXIS 8971, 2002 WL 31835085 (Tex. App.—Beaumont, Dec.18, 2002, pet. ref'd) (not designated for publication) (reversing and remanded the case for a new trial because of errors in admitting and excluding evidence). Morris did not claim that he was incompetent to stand trial before or during his first trial.

for competency of an amnesiac set out in *Wilson* and referenced in *Jackson*.[25]  The State maintains

that the *Jackson* standard does not comport with the statutory definition of competency and argues

that we should therefore reject it.

5.      *Texas competency statutes do not require courts to make a post-trial determination whether the amnesiac defendant was deprived of a fair trial based on specific findings concerning the* Wilson *factors.*

We agree with the State that our reference to the *Wilson* factors in *Jackson* to measure the

rationality of a jury's pre-trial assessment of a defendant's competency to stand trial was peculiar.

The federal court in *Wilson* described factors that it thought were relevant, not to a pre-trial

competency jury's verdict, but to a trial judge's post-trial determination whether, as the trial on the

merits actually unfolded, the amnesiac defendant was deprived of a fair trial.[26]  Only the first factor

cited by the *Wilson* court, "the extent to which the amnesia affected the defendant's ability to consult

---

[25] This Court did not specifically apply the six distinct *Wilson* factors to the evidence; we merely listed them and, after setting out the evidence introduced at trial, concluded that "[a]pplying the foregoing standards to the instant case, we cannot say that appellant did not receive a fair trial."  548 S.W.2d at 692.

[26] The federal court in *Wilson* observed:

> A prediction of the amnesic defendant's ability to perform [the basic *Dusky*] functions must, of course, be made before trial at the competency hearing. But where the case is allowed to go to trial, at its conclusion the trial judge should determine whether the defendant has in fact been able to perform these functions. He should, before imposing sentence, make detailed written findings, after taking any additional evidence deemed necessary, concerning the effect of the amnesia on the fairness of the trial.

391 F.2d at 463 (footnote omitted).  This procedure has never been a part of Texas competency law or statutes.  We will not engraft such extra-statutory procedural requirements on our comprehensive legislative scheme dealing with competency to stand trial.  *See, e.g., People v. Palmer*, 31 P.3d 863, 869 (Colo. 2001) (joining other states in declining to adopt the *Wilson* post-trial procedure because "nothing in the relevant Colorado statutes or case law requires a trial court to make a post-conviction competency determination").  If the Texas Legislature desires to enact a post-conviction, retrospective procedure for reassessing the validity of a competency jury's finding, it may do so.

with and assist his lawyer," mirrors one of the two inquiries that the Texas competency statute requires.[27] Texas' competency statutes allow competency to be raised, by either party or the judge, at any time before sentence is pronounced.[28] If evidence suggesting that the defendant may be incompetent to stand trial comes to the attention of the court, it must on its own motion raise the issue.[29] But the statutes do not require a trial or appellate court, as a matter of course, to make a post-trial determination whether, as the trial actually unfolds, the amnesiac defendant was in fact deprived of a fair trial based on specific findings under the factors articulated in *Wilson*.[30] That is not to say that the *Wilson* factors may not be consulted when the question before the court is whether the

---

[27] TEX. CODE CRIM. PROC. art. 46B.003(a).

[28] TEX. CODE CRIM. PROC. arts. 46B.004(a) and 46B.005(d).

[29] TEX. CODE CRIM. PROC. art. 46B.004(b) ("If evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial.").

[30] Other courts have declined to follow this part of *Wilson*. *United States v. Andrews*, 469 F.3d 1113, 1119 (7th Cir. 2006) ("Andrews argues that this court should adopt the rigid, two-step competency evaluation process set forth by the D.C. Circuit in *Wilson* . . . . In *Wilson*, the D.C. Circuit required the district court to make an initial determination regarding the defendant's competency prior to trial, and then, at the close of trial, make findings of fact that the defendant had demonstrated his competency during the trial. . . . No other circuit, however, has adopted this comprehensive approach, and we decline to adopt it. Instead, we will continue to follow our precedent, which offers the district court flexibility in exercising its discretion."); *State v. Demarco,* 2008 Ohio 3511, at ¶ 14-15 (Ohio Ct. App. 2008) (rejecting *Wilson*'s two-step process: "DeMarco cites to no Ohio case or rule of law that requires a trial court to make detailed written findings following the trial of a defendant with amnesia or the hearing on such a defendant's motion to suppress. DeMarco relies upon [*Wilson*], but no "Ohio court [has] adopted this part of *Wilson's* holding."); *People v. Palmer*, 31 P.3d at 869 ("We likewise decline to adopt the rigid procedural requirements of *Wilson*, which includes both a pre-trial prediction as to an amnesiac defendant's competency and also a post-conviction determination as to whether a defendant had indeed been competent); *State v. Owens*, 807 P.2d 101, 106-07 (Kan. 1991) (same); *State v. Peabody*, 611 A.2d 826, 833 (R.I. 1992) (same).

amnesiac defendant was deprived of a fair trial.[31]  They may be relevant.[32]  But the sole question presented in this appeal was whether the competency jury's verdict was against the great weight and preponderance of the evidence.[33]  An appellate court measures the propriety of the competency verdict based on the evidence before the jury at the time of the verdict under the relevant legal standard set out in art. 46B.003(a).[34]  We agree with the court of appeals's first holding: The

---

[31] In *Pitonyak v. State*, 253 S.W.3d 834, 855-57 (Tex. App.—Austin 2008, pet. ref'd), the Austin court of appeals used the *Wilson* factors in rejecting the defendant's claim that he raised a question of his competence to stand trial by testimony that he could not remember what happened during the early morning hours when the murder victim was shot in his apartment: "There is no evidence suggesting that appellant might have been incompetent to stand trial. Having considered the record in light of the factors identified in *Wilson* and *Jackson*, we conclude that appellant's claimed inability to remember the shooting for which he was on trial did not result in a trial that was fundamentally unfair."  So, too, might a reviewing court consider the TEX. CODE CRIM. PROC. art. 46B.024(2) factors.

[32] *See People v. Palmer*, 31 P.3d at 869.

[33] In this case, appellant specifically requested that the trial judge make a retrospective determination of incompetency.  After the close of evidence at the guilt phase of trial, the following exchange occurred:

[Defense Counsel]:   Also, Your Honor, we ask the Court to determine as a matter of law that [the appellant] is incompetent to stand trial based upon the evidence presented concerning the destruction of evidence, the inability of [the appellant] to testify in his own behalf, and the stipulation of the State that he has no memory after – based on the injuries.

The Court:                That would be denied.

On appeal, appellant has not claimed any error based on this post-trial ruling, nor did he argue that due process compelled the trial judge to take another look at the competency issue.

[34] *See, e.g., Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) ("An appellate court's review of the record itself is generally limited to the evidence before the trial court at the time of the trial court's ruling."); *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) (applying general rule to review of trial court's ruling on speedy-trial motion).  *See generally*, George E. Dix & Robert O. Dawson, 43A TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 43.453 (2d ed. 2001).

competency jury was entitled to credit the opinion testimony of the State's experts that the appellant was competent under art. 46B.003(a). Thus, we agree with the court of appeals that "[t]he jury's verdict rejecting Morris's claim of incompetency was not against the great weight and preponderance of the evidence."[35]

The jury heard psychiatric testimony that indicated that the *Dusky* constitutional and Texas statutory standards had been met and that any inability that appellant might have in recalling and recounting the events during the amnesiac "interval" did not render him incapable of consulting with his lawyers with a reasonable degree of rational understanding. Dr. Rosenblatt testified that appellant was "aware of the nature of the charges against him, aware of the potential outcomes and possible consequences of retrial," all of which suggests "that he does have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." And,

> besides what I just told you about knowing the nature of the charges against him, for example and awareness of potential outcomes and consequences of trial, he also was conversing about the other events of the evening except the specifics of that interval of the boating accident. And the fact that he's able–and that, plus the fact that he was able to name people as potential witnesses on his behalf suggests a factual understanding of the proceedings against him, whether or not he maintains a factual understanding of the specific events for which he appears to be amnesic.

Appellant was able to give Dr. Rosenblatt his account of what he did recall:

> What he told me is that since he had been drinking, that he felt it was not reasonable to drive the boat and thus he decided to go to sleep instead. He also told me that a place he customarily kept the keys to the boat was in the area where the keys were supposed to go, and that he presumed that Mr. Carlin had, despite his asking him not

---

[35] *Morris*, 214 S.W.3d at 169. When a defendant challenges a jury finding on which he bears the burden of proof, "the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990). But review by the Court of Criminal Appeals is limited to "legal sufficiency" of the evidence. *White v. State*, 591 S.W.2d 851, 854-56 (Tex. Crim. App. 1979).

to go over there, nonetheless picked up the keys[.]

He also told Dr. Rosenblatt that

> since the time of his recovery from the injury, that some people have come forward to him who apparently have something to say in terms of bearing on the facts of the case; and I don't think he would refute those because they have things to say which were complimentary to his cause.

The jury could infer from these statements that appellant had a viable defense: He wasn't driving; Carlin was.

The court of appeals appropriately resolved appellant's "great weight and preponderance" claim by deferring to the jury's credibility determinations.  We also note that what we stated in *Jackson v. State*–that "no case yet reported . . . has held that the inability to recall the event charged because of amnesia constitutes mental incapacity to stand trial,"[36]–remains true today.[37]  This is because the competency question assesses the defendant's mental condition at the time of trial.  In that regard, a defendant's amnesia is akin to "missing"evidence.[38]

In his plight, the amnesiac differs very little from an accused who was home alone,

---

[36] 548 S.W.2d at 691.

[37] *See* Jonathan M. Purver, Annotation, *Amnesia as Affecting Capacity to Commit Crime or Stand Trial*, 46 A.L.R.3d 544 at *4 (1965-78 & Supp. 2009) ("all of the cases in this annotation dealing with capacity to stand trial have recognized, either expressly or by necessary implication, that the amnesia of the defendant does not per se render him incapable of standing trial or receiving a fair trial.");  James E. Tysse, *Note: The Right to an "Imperfect" Trial—Amnesia, Malingering, and Competency to Stand Trial*, 32 WM.MITCHELL L. REV. 353, 354 (2005) ("American courts have never found a defendant incompetent to stand trial solely because of amnesia.") (internal quotation marks and citation omitted); *United States v. Andrews*, 469 F.3d at 1119 (federal circuit courts of appeals have "noted that amnesia about the crime does not render a defendant per se incompetent to stand trial").

[38] *See Morrow v. State*, 443 A.2d 108, 112-13 (Md. 1982) (collecting cases and commentaries to the effect that amnesia does not give rise to a finding of incompetency, as it is akin to "missing" evidence or witnesses).

asleep in bed, at the time of the crime or from a defendant whose only witnesses die or disappear before trial. Furthermore, courts, of necessity, must decide guilt or innocence on the basis of available facts even where those facts are known to be incomplete, and the amnesiac's loss of memory differs only in degree from that experienced by every defendant, witness, attorney, judge, and venireman. How much worse off is a generally amnesic defendant on trial for murder, for example, than one who remembers all but the dispositive fact: who struck the first blow?[39]

Second, other courts have noted that a contrary rule "would unduly hamper the State's interest in the prosecution of violators of its criminal laws and jeopardize the safety and security of other citizens."[40] As one court put it:

> When it is considered that the result of an order finding defendant unfit for trial in these circumstances would be outright release, assuming the amnesia is permanent and there is no other mental defect sufficient to warrant commitment, . . ., it can be more easily understood why all the courts which have passed on this question have refused to allow amnesia to be classified as the sort of mental defect causing incapacity to stand trial.[41]

A third reason to reject the *per se* rule is that "amnesia can easily be feigned."[42]

In this case, there was no assertion that appellant's amnesia was feigned. And we do not discount the possibility that there might one day be an extraordinary case in which an inability to

---

[39] *See* Comment, *Amnesia: a Case Study in the Limits of Particular Justice*, 71 Yale L.J. 109, 128 (1961).

[40] *State v. Pugh*, 283 A.2d 537, 542 (N.J. 1971) ("Even if in fact defendant did not remember the details of the crime, he would still be competent to stand trial. Amnesia concerning the crime does not bar prosecution. . . . Amnesia concerning the crime does not render a defendant unable to comprehend his position or to consult intelligently with counsel in the preparation of his defense.").

[41] *People v. Francabandera*, 310 N.E.2d 292, 296 ( N.Y.2d 1974); *see generally*, WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW 8.1(a) (2d ed. 2003).

[42] *State v. Owens,* 807 P.2d 101, 107 (Kan. 1991).

recall the charged event because of amnesia could constitute mental incapacity to stand trial.[43]  This

is not one of them.  Here, there was ample evidence that appellant was competent to stand trial

because he had (1) a sufficient present ability to consult with the lawyer with a reasonable degree

of rational understanding; and (2) a rational as well as factual understanding of the proceedings

against him.[44]

---

[43] *Wilson* is much cited but rarely followed, and virtually never has it led to a finding of incompetency to stand trial.  We have found one unpublished case:  In *State v. McIntosh*, No. 87-2215, 1988 Wisc. App. LEXIS 875 (Wis. Ct. App. Aug. 25, 1988), the court applied the *Wilson* factors and found that the defendant had not had a fair trial.  McIntosh ran a stop sign and collided with another vehicle, killing its driver.  *Id.* at *10.  McIntosh received severe head injuries in the crash and had no memory of it.  Investigators found that McIntosh's right brake line was severed.  But whether his brake line broke prior to the accident or was severed in the accident could not be determined from the physical facts.  *Id.* at *11-14.  McIntosh's defense was that his brakes failed.  *Id.* at *14.  The court of appeals held that McIntosh's loss of memory substantially affected reconstruction of this critical evidence.  He did not receive a fair trial because the critical evidence of brake failure could not be extrinsically reconstructed without his testimony and the strength of the prosecution's case did not negate his reasonable hypothesis of innocence.  *Id.* at *23.  There was a real possibility that the amnesia might have been "locking in" exculpatory information.  *Id.* at *23-24.

There is also one *amnesia plus* case.  *State ex rel. Sisco v. Buford*, 559 S.W.2d 747, 748 (Mo. 1978) ("The evidence clearly supports the finding of the trial court that relator cannot aid counsel in the defense of his case. . . . [T]he evidence indicates that this is not merely a case of amnesia as to the period in question.  The witnesses testified that as a consequence of the gunshot wound and the resulting loss of a portion of the brain, what has happened to relator is equivalent to a prefrontal lobotomy, an operation utilized to attempt to decriminalize a person with a violent personality.  If successful, such an operation creates a neuter personality.  Such person can dress and feed himself and do some handiwork.  He could know, as relator did, that he was charged with killing his girl friend.  However, . . . a prefrontal lobotomy type condition disturbs initiative and in almost all instances causes a marked loss of a person's 'critical faculty,' or, in other words, disturbs their ability to correctly evaluate their behavior or the adequacy of their action.  As a result . . . relator cannot in an orderly fashion help counsel in the preparation of his defense.").

[44] TEX. CODE CRIM. PROC. art. 46B.003(a).  And, even if one were to indulge in a post-conviction retrospective assessment of appellant's competency, it is clear that not only was appellant competent to stand trial, he competently mounted a very vigorous defense.

**B.      The appropriate remedy for an unlawful stacking order is its deletion.**

*1.      The trial court's stacking order.*

The jury convicted appellant of three counts of intoxication manslaughter and sentenced him to eighteen years on each count. When a defendant is convicted of multiple counts of intoxication manslaughter, the trial judge has authority to cumulate the sentences or to have them run concurrently.[45]  In this case the trial judge stacked the sentence in Count II onto Count I. The judge then purported to stack twelve years of Count III onto Count II: "Six years of the 18-year sentence in . . . Count III, . . . shall run concurrent with . . . Count II . . . ; and the remaining 12 years shall run consecutive to the sentence in Count II . . . ."  This resulted in a 48 year sentence. Recognizing that this was an unorthodox sentence, the trial judge pronounced an alternative sentence, stacking all three counts: "The Record should be very clear, in the event there is a challenge as to whether I can do what I'm doing, if I can't it's consecutive for 54 years."

*2.      The court of appeals's reformation of the judgment.*

The court of appeals held that the partial cumulation order was unlawful under *Ex parte Sadler*.[46]  In that case, we had held the that a trial court was without authority to partially cumulate

---

[45] When the defendant is convicted of two or more offenses, the trial court generally has discretion to order those sentences to run either consecutively or concurrently. TEX. CODE CRIM. PROC. ANN. art. 42.08.  If, however, the defendant is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single action, the trial court is generally required to order that the sentences run concurrently. TEX. PENAL CODE § 3.03(a).  But, as an exception to that rule, if the convictions are for intoxication manslaughter arising out of the same episode, the trial court may order that the sentences run concurrently or consecutively. *Id.,* § 3.03(b)(1)(A).

[46] *Morris*, 214 S.W.3d at 190 ("The issue now before us was resolved in *Ex parte Sadler,* [283 S.W.2d 235 (Tex. Crim. App. 1955)].  In reviewing article 774 of the Code of Criminal Procedure, the statute from which article 42.08 is derived, the Court of Criminal Appeals held that a trial court was without authority to partially cumulate two twenty-five year sentences to

two twenty-five-year sentences to fashion a thirty-five-year sentence.[47]   The court of appeals

therefore set aside the trial court's order partially cumulating Count III.  The court reformed the

judgment so that appellant's sentence on Count III runs concurrently with his sentence on Count II.

It affirmed the trial court's order cumulating Count II and Count I.

3.        *The parties' arguments.*

Both parties disagreed with the court of appeals's resolution.  Appellant argues that the entire

stacking order is invalid and should be deleted with the judgment so reformed; the State argues that

the judge's alternative sentence should be imposed.  The State also argues that, if there had been no

stated alternative sentence, the appropriate remedy would have been a remand to the trial court.

4.        *Unlawful cumulation orders do not constitute reversible error.*

In *Beedy v. State*,[48] a case decided after the parties submitted their briefs in this case, we

addressed a nearly identical issue.  There, the trial court had stacked a ten-year deferred-adjudication

community-supervision term onto a twelve-year prison sentence.[49] The court of appeals, noting that

the trial judge did not have the authority to stack the deferred adjudication community supervision

term onto his prison sentence, deleted the cumulation order.[50]  The State sought further review,

arguing that the case should have been remanded for a new punishment hearing.  We held that an

---

require the defendant to serve thirty-five years in jail.  As Article 42.08 is not materially different
than Article 774, we conclude that the holding in *Sadler* prohibits trial courts from partially
cumulating criminal sentences.") (internal cite omitted).

[47] *Sadler*, 283 S.W.2d at 236-37.

[48] 250 S.W.3d 107 (Tex. Crim. App. 2008).

[49] *Id.* at 109.

[50] *Id.*

unlawful cumulation order did not constitute reversible error under TEX. CODE CRIM. PROC. art.

44.29 and that the proper remedy for the unlawful cumulation order was to reform the judgment to

delete the cumulation order, as the court of appeals had done.[51]

> We also held,

> In upholding the court of appeals's decision to delete the cumulation order in this case, we do not mean to suggest that we would reach the same conclusion in a case where the trial judge had the authority to cumulate but entered, at his discretion under Article 42.08(a), Texas Code of Criminal Procedure, a cumulation order that lacked the requisite specificity.[52]

The present case, however, is not one involving specificity.  Specificity cases are those that deal with

the sufficiency of the order cumulating sentences, *i.e.*, whether the order contained the necessary

elements or essential recitals such as case numbers, county, and terms of years of prior sentences.[53]

In this case, as in *Beedy*, the trial judge simply did not have the authority to enter the order he did.

*Beedy* controls this case.  The court of appeals appropriately deleted the unlawful portion and left

---

[51] *Id.* at 113.  In reaffirming our cases holding that an unlawful cumulation order is remedied by reforming the judgment to set aside the order, we noted in *Beedy* that 1) "we have always remedied an unlawful cumulation order by reforming the trial court's judgment to delete the unlawful order," rather than reversing, and the Legislature presumably, in amending Article 44.29, approved of this remedy; 2) "a defendant is permitted, on remand for re-sentencing under Article 44.29(b), to elect to have a jury assess punishment.  Thus . . . there is no foregone conclusion that a remand for re-sentencing would give the trial judge an opportunity to correct the mistake and fashion a punishment for the defendant that approximates, as closely as possible, what was originally intended;" 3) we have an "interest in fostering judicial economy and conserving scarce judicial resources" and "deletion of an unlawful cumulation order is an efficient corrective action that removes the illegality from the judgment while leaving the remaining, lawful portions of the judgment intact."  *Id.* at 113-14.

[52] *Id.* at 114.

[53] *Young v. State*, 579 S.W.2d 10, 11 (Tex. Crim. App. 1979) (cumulation orders should contain: (1) the trial number of the prior conviction; (2) the correct name of the court where the prior conviction was taken; (3) the date of the prior conviction; (4) the term of years of the prior conviction; (5) the nature of the prior conviction).

the lawful portion of the order intact, notwithstanding the trial court's pronouncement of an

alternative sentence.  We agree with other state courts court that have recently addressed this same

issue and held that a trial court is without authority to impose alternative sentences.[54]

## III.

Therefore, because the court of appeals properly found that the competency jury's verdict

rejecting appellant's claim of incompetency was not against the great weight and preponderance of

the evidence and properly deleted the unauthorized portion of the trial judge's cumulation order, we

affirm the judgment of the court of appeals.

Delivered: November 18, 2009

Publish

---

[54] *Ben-Yisrayl v. State,* 908 N.E.2d 1223 (Ind. App. 2009).  The Indiana court explained,
[D]esignated alternative sentences, in theory [are] arguably never simultaneously
imposed in violation of double jeopardy.  Nevertheless, the imposition of two
sentences, with one automatically to take effect upon the vacation of the other,
especially when the other remains viable and the focus of the proceedings, creates
needless risk for overlap and accompanying double jeopardy violations.
    With respect to practical considerations, it is apparent from this case that
the alternative sentencing scheme is fraught with peril.  By providing for one
imposed sentence and another potential sentence, this scheme creates ambiguity
and confusion with respect to questions of waiver and preservation of error, it
blurs issues available for and addressed upon review, and it obfuscates orders and
instructions upon remand.  Perhaps most significantly, it fundamentally alters
standard appellate procedure by either circumventing the direct appeal process or
tolling it indefinitely . . . .
*Id.* at 1230.  *See also People v. Corbett*, 713 P.2d 1337, 1339 (Colo. Ct. App. 1985) ("The
statutes do not provide any authority for an alternative sentence such as the trial court imposed
here in the event the death penalty were found to be unconstitutional."); *State v. Sturgis*, 85 A.
474, 476 (Me. 1912) ("It is fundamental law that the sentence in a criminal case should be
definite and certain, and not dependent on any contingency or condition" and "a sentence in the
alternative is bad for uncertainty.").